This is an appeal from a summary judgment entered against the plaintiff, John W. McDonald, on a finding that McDonald had no standing to bring his claims of fraud, breach of a stock purchase agreement, and improper issuance of a dividend. The summary *Page 1066 
judgment did not affect the plaintiff's claim of breach of an employment contract or his claim for moving expenses. The trial judge made the summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P.
 FACTS
On May 6, 1985, plaintiff, John W. McDonald, and defendant David J. Slyman entered into a written agreement wherein McDonald was to be hired as an employee of a corporation to be formed by Slyman with its principal office to be located in Sheffield, Alabama. The corporation was to produce aluminum die cast parts at a former Ford Motor Company plant in Sheffield. McDonald was hired as president and Slyman was chairman of the board. At the time this agreement was executed, both parties were residents of the State of Ohio. The corporation, U.S. Die Casting Development Company, was incorporated as an Ohio Corporation on or around July 12, 1985, with 300 shares of capital stock issued, and with David J. Slyman becoming the majority stockholder with 200 shares of the issued stock, and with John W. McDonald becoming the minority stockholder with 100 shares of the issued stock.
On August 20, 1985, three separate written agreements were executed, as follows: An "agreement" entered into by John W. McDonald, David J. Slyman, and U.S. Die Casting Development Company; an "employment agreement" entered into by U.S. Die Casting Development Company and John W. McDonald; and a "stock purchase agreement" entered into by John W. McDonald, David J. Slyman, and U.S. Die Casting Development Company. The "stock purchase agreement" is one of the main subjects of this appeal.
On December 27, 1985, Slyman hand-delivered to McDonald a letter that read as follows:
 "Pursuant to Article I of the Stock Purchase Agreement which we executed on August 20, 1985, I hereby exercise my option to purchase the one hundred (100) shares of U.S. Die Casting 
Development Co. which you own. I am enclosing a bank check for $300,000 in full payment of the purchase price. Please sign your stock certificate on the back and deliver it to me forthwith.
"Time is of the essence in this transaction.
 "Very truly yours, "s/David Slyman
"Hand Delivered"
McDonald on that date refused to accept the check for $300,000 offered by Slyman on the grounds that it was not clear to him that the check represented Slyman's personal funds, as opposed to funds of the corporation. On or around February 28, 1986, a check drawn on U.S. Die Casting Development Company was deposited by a representative of the company into the personal checking account of John W. McDonald. This was done without the knowledge or consent of McDonald, but he did use at least some of the funds.
McDonald contends that Slyman took substantial undeclared or constructive dividends from the corporation in the manner of expenses reimbursed, advances, or otherwise, and that Slyman took an undeclared dividend from the corporation when he used corporate funds in the sum of $300,000 to exercise his personal option to purchase McDonald's stock, and that in doing so Slyman breached the separate agreements of August 20, 1985, and December 27, 1985, concerning the stock purchase, and that Slyman defrauded McDonald in using corporate funds to purchase the McDonald stock.
According to an affidavit filed by McDonald, he and Slyman had experienced problems and disagreements almost from the start regarding the interest McDonald would have in the corporation.[1] Unquestionably, *Page 1067 
McDonald had a one-third equity interest.
 I
McDonald filed suit, alleging breach of the stock purchase agreement and his employment contract, fraud in the sale of the stock, and the improper payment of a dividend to Slyman in the form of the stock purchase price. One of the main issues before this Court concerns the significance of the origin of the purchase price money.
 II
McDonald, in his brief on appeal, summarizes his argument why summary judgment was inappropriate in this case:
 "It is submitted by the plaintiff, that the foregoing unequivocally creates an issue of material fact as to whether or not Slyman breached the original 'Stock Purchase Agreement' and the subsequent 'Stock Purchase Buy-Sell Agreement' by using corporate funds to exercise his personal option to purchase the plaintiff's stock, and further, whether or *Page 1068 
not Slyman defrauded the plaintiff by representing and warranting that he was exercising his personal option to purchase the said stock and then using corporate funds to do so. This issue is further supported by the Corporate Balance Sheet of June 30, 1986, which shows that instead of Slyman purchasing the plaintiff's stock for his own account, and with his own personal funds, that the stock is shown on said balance sheet as being treasury stock of the corporation purchased in February of 1986 (lower right column). The plaintiff was obviously damaged by Slyman's breach of said agreements and/or his fraudulent representations in that, the plaintiff under said 'stock purchase agreement,' had no obligation to sell his stock to anyone or any entity, including the corporation, other than to Slyman personally for the $300,000.00 amount. The plaintiff's damage is further supported by the corporate 'Audited Financial Statements' of September 30, 1985, which shows on page three thereof, that the total stockholders' equity as of said date was $1,785,517.00 or that as of said date, the plaintiff's one-third (1/3) equity interest as represented by his stock was worth in excess of $595,000.00. The plaintiff's damage is further supported by the aforestated 'Corporate Balance Sheet', which shows that as of June 30, 1986, the shareholders' equity in the corporation was at that time $2,743,339.00 or an increase of approximately $1,000,000.00 from September 30, 1985, which would indicate that as of February 20, 1986, the date on which the $300,000.00 was deposited to the plaintiff's account that his equity interest was in excess of the $595,000.00 figure."
 III
The terms of the stock purchase agreement are clear and unambiguous; therefore, its construction may be properly determined by summary judgment. Terry Cove North, Inc. v.Baldwin County Sewer Authority, Inc., 480 So.2d 1171 (Ala. 1985); Warrior Drilling Engineering Co. v. King, 446 So.2d 31
(Ala. 1984). The option to purchase states, "McDonald gives and grants unto Slyman an exclusive option to purchase the McDonald stock, any part thereof, from time to time on or before July 31, 1990, for the sum of three thousand dollars ($3,000.00) per share." McDonald's argument that this agreement granted Slyman a personal right to buy the stock and that the funds had to come from Slyman personally is not supported by the plain language of the agreement. The source of payment for the stock is nowhere specified in the document. If a contract in its terms is plain and free from ambiguity, there is no room for construction, and it is the duty of the court to enforce it as written. Kinnon v. Universal Underwriters Ins. Co.,418 So.2d 887 (Ala. 1982). McDonald, therefore, has no basis for his breach of contract action.
Concerning his action for improper payment of a dividend, we note that McDonald was not a stockholder after the purchase price had been paid in accordance with the terms of the agreement; therefore, he could not bring a shareholder's derivative suit. One bringing a derivative action must be a stockholder not only at the time the alleged wrong was committed, but generally also at the time suit was commenced.Dehaas v. Empire Petroleum Co., 435 F.2d 1223 (10th Cir. 1970);Werfel v. Kramarsky, 61 F.R.D. 674 (S.D. N.Y. 1974); Green v.Bradley Const., Inc., 431 So.2d 1226 (Ala. 1983).
 IV
We now address the question whether McDonald can sue in his own name. We think he can. Ordinarily, a stockholder may not bring an action in his own name for an alleged fraudulent transfer of corporate property to another stockholder; such a suit must be by or in behalf of the corporation. Green v.Bradley Const., Inc., 431 So.2d 1226, 1229 (Ala. 1983); quoting 19 Am.Jur.2d Corporations § 534 (1979). However, if the stockholder alleges that wrongs have been committed by the corporation as a direct fraud upon him, and that such wrongs do not affect other stockholders, that one stockholder *Page 1069 
may maintain a direct action in his individual name. Green v.Bradley Const., Inc., supra, at 1229.
The facts of this case present that very situation. While agreeing to sell his stock to Slyman for $3,000.00 per share, McDonald had a right to expect, while he was a stockholder, that the directors of the corporation would act reasonably with regard to the management of the corporation and that dividends, if declared, would not be disproportionate. The rule regarding the corporation's obligation to pay dividends is stated inWolfe v. Underwood, 96 Ala. 329, 333, 11 So. 344, 345-46
(1891), as follows:
 "The fact that profits have accrued in the transaction of the corporate business does not necessarily impose upon the directors the duty of distributing them as dividends to the stockholders. The directors are entrusted with the management of the property and business of the corporation, and in the exercise of their functions are vested with a large discretion. Their relations with the corporation and its stockholders are of a fiduciary character. They are under the duty to the stockholders to exercise their judgment and discretion in the conduct of the business of the corporation. On questions of business policy and management their decisions are controlling, and their acts will not be disturbed or interfered with by the courts, at the instance of a stockholder, unless they are guilty of a willful abuse of their discretion, or act in bad faith, or in disregard of duties imposed upon them by law. They are charged with the duty of determining what disposition shall be made of the earnings or profits of the enterprise. There may be honest differences of opinion as to whether accrued earnings should be applied to the payment of debts, due or to fall due in the future, or in the development of the company's business, or to a surplus fund to provide for future contingencies and to insure continued prosperity, or should be distributed among the stockholders in dividends. Profits earned by an ordinary business corporation can not be arbitrarily withheld from the stockholders. The directors would not be permitted to deprive the stockholders of the benefits of the success of the scheme for the prosecution of which they associated themselves together. Only the furtherance of some legitimate purpose of the enterprise can justify the exclusion of stockholders from the enjoyment of net profits. But so long as the directors, in the honest exercise of a reasonable discretion, devote the capital and the earnings to the carrying on of the business contemplated by the corporate association, no mere differences of opinion among the stockholders as to the wisdom of the course pursued can justify the interposition of the courts for the purpose of controlling or interfering with the management of the corporation by its constituted authorities. Smith v. Prattville Manufacturing Co., 29 Ala. 503; Pratt v. Pratt, 33 Conn. 446; Williston v. Michigan Southern N.I.R. Co., 13 Allen, 400; Chaffee v. Rutland R. Co., 55 Vt. 110; Karnes v. Rochester G.V.R. Co., 4 Abbott's Pr. (N.S.) 107; Scott v. Eagle Fire Ins. Co., 7 Paige Ch. 198; Park v. Grant Locomotive Works, 40 N.J. Eq. 114; Cook on Stocks and Stockholders, § 539; 2 Beach on Private Corporations, 447; Taylor on Private Corporations, §§ 562, 653."
Taking plaintiff's statements as true — because on a motion for summary judgment we must view the evidence and all reasonable inferences to be drawn from that evidence in a light most favorable to the non-moving party — we find that there is some evidence that the corporation, although not formally declaring a dividend, nevertheless made payments to Slyman or on his behalf that were personal in nature. The evidence indicates that the $300,000 check tendered to McDonald was refused, and that he objected at that time to the use of the corporation's funds. As we understand McDonald's argument, he is contending that he should be allowed to maintain an action against the corporation and to obtain at least hisproportionate one-third share of any "constructive dividends" *Page 1070 
that were paid by the corporation, and that he has standing to sue, even though he is no longer a stockholder, because he says "wrongs have been committed by the corporation as a direct fraud upon [me], and such wrongs do not affect other stockholders." Green v. Bradley Construction, Inc., supra. We agree.
The Green rule is especially applicable under the facts of this case, because there is evidence that the corporation, over McDonald's objections, allowed its funds, which were generated during the entire period McDonald held his stock, to be used by the majority stockholder to exercise an option that divested McDonald of all his stock.[2] While we do not believe that McDonald can avoid his obligation to transfer his stock as he agreed to do, we do hold that McDonald, as the only other stockholder, was specifically affected if an improper dividend was paid to the majority stockholder and a proportionate dividend was not paid to him. He, therefore, was entitled to bring an action against the corporation and to recover such damages as he may prove. We do not address whether, in fact, McDonald can prove his claim, only that he is entitled to try.
McDonald's contention that a fraud was committed upon him by Slyman has no merit. The elements of fraud are: (1) a false representation, (2) concerning a material fact, (3) reliance by the plaintiff upon that false representation, and (4) damage to the plaintiff as a proximate result of the reliance. Webb v.Renfrow, 453 So.2d 724 (Ala. 1984); George v. Nevett,462 So.2d 728 (Ala. 1984). As noted earlier in this opinion, McDonald had no right to refuse the purchase price of the stock; therefore, even if Slyman did misrepresent the source of the funds to McDonald, that would not matter because the source of the funds was immaterial on this aspect of the case. As a result, McDonald's allegation of fraud is unfounded.
Based on the foregoing, we affirm the summary judgment as to the fraud count and as to the allegation of a breach of the stock purchase agreement. The judgment is reversed, however, as to the claim that there was a dividend paid to Slyman and that it was improper without a corresponding payment to McDonald, and the cause is remanded for further proceedings on that claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.
[1] McDonald, in an affidavit filed in connection with his own motion for summary judgment, stated the following:
"AFFIDAVIT OF JOHN W. McDONALD
"Subject: 'Tax Problem' of John McDonald
 "My name is John W. McDonald. I was born July 8, 1933, and I have personal knowledge of the things and matters stated in this Affidavit.
 "Following the sale of the first four die casting machines from U.S.D.C. to General Motors in late June, 1985, Dave Slyman desired to take a dividend, to my exclusion, and therefore attempted to deny the existence of my equity until after he had done so. Prior to that, the written record and formal verbal statement by Dave Slyman in meetings with General Motors, in meetings with Alabama government officials, and in writing to these same officials, Dave Slyman dignified the existence of my one-third equity in the company. (See D.J. Slyman letter to Howard Gamble, June 11, 1985, for typical reference.)
 "I was, of course, pressing for a formal recognition of my interest by the formal act of incorporation, which Dave Slyman agreed to assume the responsibility for in the letter contract of early May, 1985.
 "When he finally acted in mid-July, 1985, to carry out the task of incorporating the company as he had agreed, Dave Slyman filed with the Securities office in Ohio an application which did not dignify my one-third equity. (My securities were never registered as required by Ohio law.)
 "In filing the S-Corp status request forms in July, 1985, he ignored the de facto existence of my one-third equity as well. To elect S-Corp status, the I.R.S. requires that all stockholders approve of this election.
 "I learned of the incorporation filing only by a visit to the Securities office of the State of Ohio in late July, 1985, and by examining the records. This act produced my request for the letter of July 16, 1985, from Dave Slyman to me. In accepting the compromise of the letter, I was desirous of preserving the benefit of the single taxation of dividends provided by the I.R.S. for S-Corp. It was reasonable for me to expect dividends as well.
 "In essence, I had no long-term capital gain problem as stated by Dave Slyman. Under Ohio law, a de facto corporation could have been demonstrated to be in existence as early as May 30, 1985, and Dave Slyman's written statements (including the first U.D.A.G. application filed in May, 1985, rejected by H.U.D. in early June, 1985, for lack of financing) and our letter contract agreement of early May, 1985, were sufficient to demonstrate the existence of my one-third equity. (I believe under Ohio law the only challenge to the existence of a de facto corporation can come from the state.) My equity went from a one-third interest in a de facto corporation prior to July 16, 1985, to a one-third interest in a de jure corporation after that date.
 "In permitting David Slyman to use the charade of a tax problem in December, 1985, as an explanation for my rejection of the various company checks for my equity, I chose to avoid the obvious.
 "Dave Slyman was attempting, through the use of an unidentified check on December 27, 1985, presented to me as his own, to not only hide his use of company funds or use of equity funds produced by the sale of the G.M. machines from me but from the trustee of AmSouth Bank as well. In a meeting held in the office of Mike Underwood, V.P. of AmSouth Bank in Birmingham, in late March or early April, 1986, Mr. Underwood expressed the bank's displeasure at Dave Slyman's violation of the Bond Covenant precluding the creation of Treasury Stock, and Bond Funds were subsequently withheld until June of 1986.
 "It is believed the only official aware in January, 1986, of the use of company funds was Dave Slyman's attorney, Robert Walston, as stated in his letter of May 8, 1986, to Ernst and Whinney.
 "Any so-called 'tax problem' which I might have had would have been created by Dave Slyman's repeated breach of contracts. It is, however, illogical to state any so-called 'tax problem' was resolved by me when it was Dave Slyman who wrote numerous checks between December 27, 1985, and February 21, 1986, on the company, to satisfy his contractual obligation to use personal funds to exercise the option on my stock. Of course, the use of his personal funds of any kind would have been after tax dollars when the use of company funds to satisfy his personal obligation were not. The I.R.S. may rule that Dave Slyman has a tax problem since there is a benefit to him, and since I have had to file I.R.S. form 8082, the I.R.S., I believe, will ultimately rule Dave Slyman took a dividend."
[2] We do not address what tax consequences, if any, arise from those transactions. The parties are in sharp disagreement on the so-called "tax" issue.