80 So.3d 171 (2010)
PUBLIC BUILDING AUTHORITY OF the CITY OF HUNTSVILLE
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY.
Public Building Authority of the City of Huntsville.
v.
Dawson Building Contractors, Inc.
Dawson Building Contractors, Inc.
v.
Public Building Authority of the City of Huntsville.
Fibrebond Corporation, Raley & Associates, Frank J. Raley, Ruffin Enterprises, Inc., Richard McKee Hall, Enhanced Technical Construction, Inc., Bibler Masonry, Inc., Nolan Maintenance Company, Inc., and American Pan & Engineering Company, Inc.
v.
Public Building Authority of the City of Huntsville.
1080733, 1080734, 1080735, 1080736, 1080737, 1080738 and 1081297.
Supreme Court of Alabama.
October 8, 2010.
Rehearing Applications Denied September 16, 2011.
*172 Edward P. Meyerson and Donald J. Nettles of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Birmingham; and Michael I. Less of Less, Getz & Lipman, PLLC, Memphis, Tennessee, for Public Building Authority of the City of Huntsville.
David A. Dial, Nicholas P. Panayotopoulos, and Laura L. Voght of Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, Atlanta, Georgia; and Andrew P. Campbell and George A. Brockwell of Leitman, Siegel, *173 Payne & Campbell, P.C., Birmingham, for Dawson Building Contractors, Inc.
Andrew J. Sinor, Jr., and John S. Johnson of Hand Arendall LLC, Birmingham, and R. Scott Jenkins of Jones, Walker, Waechter, Poitevent, Carrére & Denégre, L.L.P., New Orleans, Louisiana, for Fibrebond Corporation; C. Peter Bolvig of Hall Conerly & Bolvig, Birmingham, for Frank J. Raley and Raley & Associates, Inc.; Samuel R. McCord, Birmingham, for Richard McKee Hall, Ruffin Enterprises, Inc., and Enhanced Technical Construction, Inc.; Oscar M. Price III and F. Brady Rigdon of Wallace Jordan Ratliff & Brandt, Birmingham, for Bibler Masonry, Inc., and Nolan Maintenance Company, Inc.; and Joseph A. Fawal of Fawal & Spina, Birmingham, and A. Joe Peddy of Smith, Spires & Peddy, Birmingham, for American Pan & Engineering Company, Inc.
M. Christian King, Nikaa Baugh Jordan, and Mitchell S. Ryan of Lightfoot, Franklin & White, L.L.C., Birmingham, for St. Paul Fire and Marine Insurance Company.
Samuel N. Crosby and George R. Irvine III of Stone, Granade & Crosby, P.C., Daphne, for amicus curiae The Surety & Fidelity Association of America, in support of St. Paul Fire and Marine Insurance Company.
Richard E. Smith and Oscar M. Price IV of Christian & Small, LLP, Birmingham, for amicus curiae Associated Builders and Contractors of Alabama, Inc., in support of Dawson Building Contractors, Inc.
PER CURIAM.
These consolidated appeals all arise from the same factual scenario. The Public Building Authority of the City of Huntsville ("the PBA") appeals from a summary judgment entered in favor of St. Paul Fire and Marine Insurance Company ("St. Paul") (cases no. 1080733 and no. 1080734), and it appeals by permission, pursuant to Rule 5, Ala. R.App. P., from the denial of its motion to reconsider the trial court's decision to grant Dawson Building Contractors, Inc. ("Dawson"), a partial summary judgment (cases no. 1080735 and no. 1080736). Dawson appeals by permission, pursuant to Rule 5, from an adverse portion of the trial court's order granting Dawson a partial summary judgment (cases no. 1080737 and no. 1080738). Fibrebond Corporation ("Fibrebond"); Raley & Associates and Frank J. Raley ("the Raley defendants"); Ruffin Enterprises, Inc.; Richard McKee Hall; Enhanced Technical Construction, Inc.; Bibler Masonry, Inc.; Nolan Maintenance Company, Inc.; and American Pan & Engineering Company, Inc. (hereinafter collectively referred to as "the subcontractors"), appeal by permission, pursuant to Rule 5, from the trial court's order granting in part and denying in part their motion for a summary judgment (case no. 1081297). All seven cases have been consolidated for the purpose of writing one opinion.

Facts and Procedural History
On February 4, 2004, Dawson, a building contractor headquartered in Gadsden, entered into a contract with the PBA ("the contract") pursuant to which Dawson agreed that it would act as the contractor for certain construction work on a project to build a modular jail and attendant facilities servicing the City of Huntsville and Madison County ("the project"). The contract was drafted by the PBA. Pursuant to the contract, Dawson was required to secure a penal bond in favor of the PBA ("the bond"). St. Paul issued the bond in the sum of $24,364,218, naming Dawson as the principal and the PBA as the owner and obligee.
*174 The PBA issued Dawson a notice to begin construction of the project on February 9, 2004. During construction, Dawson and various of the subcontractors informed the PBA of purported structural problems affecting the project. As a result, on October 11, 2005, the PBA suspended work on the project to investigate the situation and to identify the source of the structural problems. Construction proceeded sporadically until June 2006, when work on the project essentially halted at the PBA's direction.
On February 2, 2006, Dawson informed the PBA that Dawson was incurring substantial damage as a result of the delay. On June 6, 2006, while the PBA investigation into the structural problems was still ongoing, Dawson informed the PBA that it intended to terminate the contract.
On June 20, 2006, the PBA notified Dawson in writing that it would terminate the contract for convenience, effective June 30, 2006; St. Paul was copied on the letter. The termination-for-convenience provision in the contract states, in pertinent part:
"12.2.1.1 The Owner [the PBA] may for any reason whatsoever terminate performance under this Contract by the Contractor [Dawson] for convenience. The Owner shall give written notice of such termination to the Contractor specifying when termination becomes effective.
"12.2.1.2 The Contractor shall incur no further obligations in connection with the Work and the Contractor shall stop Work when such termination becomes effective. The Contractor shall also terminate outstanding orders and subcontracts. The Contractor shall settle the liabilities and claims arising out of the termination of subcontracts and orders. The Owner may direct the Contractor to assign the Contractor's right, title and interest under terminated orders of Subcontracts to the Owner or its designee."
In its letter terminating the contract for convenience, the PBA stated that it was reserving its right to convert the termination for convenience into one for cause if the facts warranted. The PBA's June 20, 2006, letter read, in pertinent part:
"Notwithstanding this termination by convenience, due to issues recently raised regarding the work and materials provided by Dawson, the PBA specifically reserves and does not waive any claims it currently has or may have against Dawson for defective and/or deficient work provided to the Project and/or for any latent defects arising from the work provided and/or performed by Dawson on the Project. Likewise, the PBA does not release Dawson from any of Dawson's contractual or warranty obligations.
"The PBA reserves the right to convert this termination for convenience into a termination for cause, if warranted, after the PBA has had an opportunity to inspect the work in place and review of all relevant documentation. The PBA will also look to Dawson to correct and repair any defective and/or deficient work related to the work performed or provided by Dawson on the Project. Finally, as noted herein, the PBA expressly reserves all rights of actions, claims, demands or other rights accorded by law or by contract with respect to the construction project which is the subject of the contract referenced above."
Following the PBA's termination for convenience of the contract, the PBA continued its investigation into the potential design and construction defects. On September 14, 2006, without notifying St. Paul, the PBA entered into a contract with Lee Builders, Inc. ("Lee Builders"), to *175 complete the project ("the completion contract"). The completion contract explicitly stated that Lee Builders would carry the project to completion:
"The parties acknowledge and understand that this Project was initiated and partially constructed pursuant to an earlier contract between [the PBA] and [Dawson]. That contract has now been terminated by [the PBA] effective June 30, 2006. This contract includes the completion of this Project from its current status, pursuant to recent design modifications and revisions to the project plans and specifications...."
Bruce Lee, vice president of Lee Builders, stated in his affidavit:
"From late August [of 2006] until January of 2007, Lee Builders' work on the Project was limited to site clean-up, construction preparation, on-site office trailer set-up, dewatering of the building, the installation of temporary rails on the building, the installation of a silt fence on the site, the temporary stabilization or `shoring' of identified areas of the building where life and safety concerns existed, and generally `closing-up' the building to preserve the existing interior from outside weather conditions.
"5. Between February and December of 2007, Lee Builders performed remedial work for the Project, based upon remedial drawings generated by the City of Huntsville's new structural engineer, Robinson and Associates, and/or pursuant to other directives from the City. At present, Lee Builders is working to achieve substantial completion of the Project."
On September 25, 2006, the PBA sent Dawson notice that, based on the results of its investigation, the PBA intended to convert its termination for convenience into a termination for cause. The PBA also requested a meeting with Dawson and St. Paul to discuss completion of the project.
On September 27, 2006, Dawson sued, among others, the PBA, alleging breach of contract and seeking payment owed under § 12.2.1.4 of the contract for the work performed before the PBA terminated the contract for convenience; Dawson also sought declaratory relief regarding the parties' rights and obligations under the applicable termination-for-convenience provision of the contract, § 12.2.1 (case no. CV-06-1887). The PBA responded by filing a separate action against Dawson and the subcontractors (case no. CV-06-1943).[1] The PBA alleged various tort and contract claims against the subcontractors; the tort claims included negligence, wantonness, fraud, and suppression.
In November 2006, a meeting was held between the PBA, Dawson, and St. Paul at the project site; the PBA alleges that November 2006 was the earliest St. Paul was available for such a meeting. The PBA alleges that St. Paul and its counsel toured the project site with an expert hired by St. Paul in order to inspect Dawson's work on the project.
On November 21, 2006, Dawson filed a motion for a partial summary judgment in case no. CV-06-1887, seeking a declaration from the trial court that the termination-for-convenience provision of the contract exclusively governed the parties' rights and obligations. Dawson argued that, because the PBA elected to terminate the contract for convenience, both parties' contractual obligations, except those specifically set out in § 12.2.1 of the contract, ended. The PBA opposed the motion.
On November 27, 2006, the PBA answered Dawson's complaint and asserted counterclaims of breach of contract, negligence, *176 wantonness, fraudulent misrepresentation, and fraudulent suppression. On December 4, 2006, having already canceled the contract pursuant to the termination-for-convenience provision, the PBA sent notice to Dawson and St. Paul purportedly converting the termination for convenience to a termination for cause:
"Please be advised that pursuant to [§ ] 12.2.2.1 of the Contract between Dawson Building Contractors and [the PBA], that the Contract is hereby terminated for cause. Furthermore, by copy of this letter, the PBA demands that, pursuant to [the bond], St. Paul undertake to perform its obligations under the [b]ond and complete the [contract] or obtain bids from qualified contractors, acceptable to the PBA, to complete the [contract]."
St. Paul denied the PBA's claim on December 21, 2006, citing, among other things, the PBA's termination of the contract for convenience and the completion contract the PBA had entered into with Lee Builders.
On January 3, 2007, the PBA filed an amended complaint in its action, adding St. Paul as a defendant. The PBA asserted claims of breach of contract and bad faith against St. Paul. On January 31, 2007, Dawson's action and the PBA's action were consolidated under case no. CV-06-1887 for purposes of discovery and trial.
On June 4, 2007, the PBA sent St. Paul a letter stating:
"For the last time and pursuant to the terms of the performance bond, demand is made for St. Paul to assume its obligations under the performance bond. If you wish to engage another contractor to correct and complete Dawson's work, the PBA will immediately terminate [Lee Builders'] contract for convenience and make the remaining contract fundssubject to adjust for Dawson's purported overbillingavailable to St. Paul to correct and complete Dawson's work."
On October 26, 2007, the Madison Circuit Court entered an order granting Dawson's motion for a partial summary judgment. On April 4, 2008, Dawson filed a motion for a summary judgment on the remaining claims against it, arguing that, pursuant to the trial court's order dated October 26, 2007, Dawson had no liability to the PBA. On April 21, 2008, the PBA sought reconsideration of the trial court's October 26, 2007, order pursuant to Rule 59(e), Ala. R. Civ. P, or, in the alternative, a clarification of that order. On November 5, 2008, the subcontractors filed a motion for a summary judgment as to all claims against them.
On December 9, 2008, the trial court denied the PBA's Rule 59(e) motion to alter, amend, or vacate or, in the alternative, to clarify the trial court's order dated October 26, 2007, holding that the contract had been terminated for convenience. In so doing, the trial court reaffirmed that the contract had been terminated for convenience but held that certain of Dawson's obligations survived under § 5.3 of the contract. On December 31, 2008, Dawson filed a Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate the trial court's order dated December 9, 2008, arguing that § 5.3 of the contract should not survive a termination for convenience of the contract. On January 22, 2009, the trial court denied Dawson's motion to alter, amend, or vacate the judgment.
On January 9, 2009, St. Paul filed a motion for a summary judgment, which the PBA opposed. The trial court entered a summary judgment in favor of St. Paul on January 30, 2009. On February 12, 2009, the PBA filed a Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate the trial court's order entering a summary judgment *177 in favor of St. Paul. Also on February 12, 2009, Dawson and the PBA each filed with the trial court a motion for an order certifying for permissive appeal under Rule 5(a), Ala. R.App. P., issues underlying the trial court's December 9, 2008, and January 22, 2009, orders.
On February 25, 2009, the trial court denied the PBA's Rule 59(e) motion and made its summary judgment for St. Paul final pursuant to Rule 54(b), Ala. R. Civ. P.; the PBA appealed on March 13, 2009 (cases no. 1080733 and no. 1080734). In the same order, the trial court also certified "that [its] order of December 9, 2008, as clarified by the order of January 22, 2009, is the proper subject for an interlocutory appeal."
On March 11, 2009, Dawson and the PBA filed separate petitions for permission to appeal the trial court's orders in this Court, which this Court granted (cases no. 1080735, no. 1080736, no. 1080737, and no. 1080738).
On May 20, 2009, the trial court granted in part and denied in part the subcontractors' summary-judgment motion. The trial court granted the subcontractors' summary-judgment motion as to the PBA's contract claims against them, but it denied the motion as to the PBA's tort claims against them. In denying the subcontractors' summary-judgment motion as to the PBA's tort claims, the trial court stated:
"The movants ... argue that the PBA may not assert tort claims against them. The primary basis for this argument is the economic loss doctrine, by which a cause of action in tort is barred if a commercial product malfunctioned or was defective and such malfunction or defect resulted in damage only to the product itself. The PBA defends by arguing that the economic loss doctrine has been interpreted by Alabama courts as applying only to AEMLD [Alabama Extended Manufacturer's Liability Doctrine] claims and has no bearing in a construction law dispute such as this one. While the movants cite a number of cases from other jurisdictions as authority for the conclusion that the doctrine may apply here, this Court rejects the argument. A review of reported decisions in Alabama construction cases fails to show an instance in which the economic loss doctrine has been used to bar a tort claim, and this Court will leave it up to the appellate courts whether to craft an expanded scope of this doctrine's application."
On June 17, 2009, the trial court certified for permissive appeal pursuant to Rule 5 the above portion of its interlocutory order dated May 20, 2009, which denied in part the subcontractors' summary-judgment motion. On June 30, 2009, the subcontractors filed a petition for permission to appeal the trial court's order in this Court, which this Court granted on August 11, 2009 (case no. 1081297).

Analysis

I. Cases no. 1080733 and no. 1080734

A. Additional Relevant Facts and Procedural History
The bond was written on form "AIA Document A-312," a form published by the American Institute of Architects. The bond imposes certain obligations on St. Paul in the event the PBA terminated the contract for default and satisfied certain conditions precedent set forth in the bond:
"If there is no Owner [PBA] Default, the Surety's [St. Paul's] obligation under this Bond shall arise after:
"3.1 The Owner has notified the Contractor [Dawson] and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has *178 requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract ...; and
"3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subsection 3.1; and
"3.3 The Owner has agreed to pay the Balance of the Contract Price to the surety in accordance with the terms of the Construction Contracts in accordance with the terms of the contract with the Owner."
In its motion for a summary judgment, St. Paul asserted three arguments:
"First, under Alabama law, the PBA failed to satisfy conditions precedent to St. Paul's obligations under the ... [b]ond prior to terminating Dawson for convenience. As this Court has ruled, the PBA's efforts to resurrect Dawson's Contract for the purposes of declaring Dawson in default and terminating for cause are `ineffective.' Thus, [the] PBA's post-termination efforts to declare Dawson in default and meet the other conditions of the [b]ond are immaterial. Rather, St. Paul's Principal (Dawson) was terminated for convenience without any preceding declaration of default, notice of intent to declare default, or termination for default pursuant to Paragraph 3 of the [b]ond. Consequently, St. Paul is released from any liability to the PBA.
"Second, even if the PBA could somehow establish compliance with the [b]ond's conditions precedent, this Court's Orders release [Dawson] from its performance obligations. Hence, pursuant to the well-established law of suretyship, St. Paul also is relieved of any obligations under the ... [b]ond. Indeed, St. Paul's liability for performance cannot exceed Dawson's. Third, regardless of the foregoing defenses, the PBA materially breached the terms of the Bond. Through its post-termination actions, the PBA impaired St. Paul's rights of suretyship, thereby rendering the [b]ond null and void under applicable law."
The trial court found St. Paul's first argument convincing and granted St. Paul's summary-judgment motion on that ground; the trial court did not consider St. Paul's other two arguments.

B. Standard of Review
This Court has clearly stated the standard by which it reviews the disposition of a summary-judgment motion:
"`"In reviewing the disposition of a motion for summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact" and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life *179 Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).'
"Ex parte General Motors Corp., 769 So.2d 903, 906 (Ala. 1999)."
Brown v. St. Vincent's Hosp., 899 So.2d 227, 233 (Ala.2004). "Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant." Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).

C. Discussion
The PBA alleges that the trial court's entry of a summary judgment for St. Paul was error because, the PBA argues, it fully complied with the conditions precedent to St. Paul's liability set forth in the bond. Alternatively, the PBA argues that it at least raised a genuine issue of material fact concerning its compliance with the conditions precedent set forth in the bond. We disagree with the PBA's argument, and we hold that the trial court's judgment is without error.
In Bank of Brewton, Inc. v. International Fidelity Insurance Co., 827 So.2d 747 (Ala.2002), this Court interpreted an identical performance bond, also written on form "AIA Document A-312." This Court explained the plain language of paragraph 3 of the bond, as follows:
"The plain language of paragraph 3 is that in the event of a contractor default, the surety's obligation under the bond shall arise after the occurrence of the events listed in subparagraphs 3.1, 3.2, and 3.3. The owner first must give proper notice, call a meeting, discuss the problems, and attempt to resolve them (subparagraph 3.1); then, if the problems are not resolved, the owner must declare a contractor default, formally terminating the contractor's right to complete the contract, and must declare the default at least 20 days after giving notice (subparagraph 3.2); and finally the owner must agree to pay the balance of the contract to the surety or to a new contractor who will complete the contract as originally agreed (subparagraph 3.3)."
827 So.2d at 753.
In the present case, it is undisputed that the PBA terminated the contract for convenience effective June 30, 2006. The effect of such a termination, as stated in the contract, is that "[Dawson] shall incur no further obligations in connection with the Work and [Dawson] shall stop Work when such termination becomes effective." It is clear that, based on the PBA's termination of the contract for convenience, the PBA could not have subsequently satisfied the conditions precedent in the bond. Only after the PBA terminated the contract for convenience did it attempt to satisfy the conditions precedent, which, according to the plain language of the bond, is too late. Therefore, the trial court did not err in entering a summary judgment in favor of St. Paul.
The PBA argues that its June 30, 2006, termination for convenience was conditional and, thus, could be converted into a termination for cause if it was discovered that Dawson had defaulted under the contract. We find this argument unpersuasive. It is undisputed that the contract was terminated by the PBA for convenience effective June 30, 2006. Under the terms of the contract, a termination for convenience unequivocally terminates the contract and relieves Dawson from incurring any further obligation associated with the project. There is no language in the contract allowing a termination for convenience to be converted into a termination for cause, and the PBA offers no applicable legal authority to support its position that a termination for convenience may be *180 converted to a termination for cause absent contractual language allowing such a conversion. In light of the unambiguous terms of the contract, there is no basis for reading the contract in such a way as to allow the PBA to resuscitate a dead contract so that it may re-terminate it.
The PBA also addresses the other arguments raised by St. Paul in its summary-judgment motion. However, having decided that the trial court properly entered a summary judgment for St. Paul on the ground that the PBA failed to satisfy the conditions precedent to St. Paul's obligations under the bond, it is not necessary to address the other arguments.

II. Cases no. 1080735 and no. 1080736
Pursuant to Rule 5(a), Ala. R.App. P., the trial court certified the following question of law in its certification for permissive appeal in cases no. 1080735 and no. 1080736:
"(1) Whether the PBA, as owner of a commercial construction project, could legally convert termination of its contract with Dawson ..., the general contractor, into one for cause after having previously provided notice of termination for convenience, in the absence of explicit contractual language authorizing such a conversion."
In conducting our de novo review of a question presented on a permissive appeal, "this Court will not expand its review ... beyond the question of law stated by the trial court. Any such expansion would usurp the responsibility entrusted to the trial court by Rule 5(a)[, Ala. R.App. P.]." BE&K, Inc. v. Baker, 875 So.2d 1185, 1189 (Ala.2003).
The PBA, as the appellant, alleges that the question presented by the permissive appeal is one of first impression and urges this Court to adopt what it characterizes as a two-step test set forth by the Court of Appeals of Texas in Accent Builders Co. v. Southwest Concrete Systems, Inc., 679 S.W.2d 106 (Tex.App.1984).[2] However, the interpretation of a contract does not present a novel legal issue. Rather, the rules of contract construction and interpretation are well established in Alabama and will be applied to answer the certified question presented by the trial court.
Under Alabama law, this Court, when interpreting a contract, must follow the plain language of the contract:
"`General contract law requires a court to enforce an unambiguous, lawful contract, as it is written. P & S Business, Inc. v. South Central Bell Telephone Co., 466 So.2d 928, 931 (Ala.1985). See also McDonald v. U.S. Die Casting & Development Co., 541 So.2d 1064 (Ala. 1989). A court may not make a new contract for the parties or rewrite their contract under the guise of construing it. Estes v. Monk, 464 So.2d 103 (Ala.Civ. App.1985)....
"`. . . .
"`When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state. Pacific Enterprises Oil Co. (USA) v. Howell Petroleum Corp., 614 So.2d 409 (Ala.1993).'"
*181 Dawkins v. Walker, 794 So.2d 333, 339 (Ala.2001) (quoting Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 35-36 (Ala. 1998)); see also Southland Quality Homes, Inc. v. Williams, 781 So.2d 949 (Ala.2000) (recognizing that the primary source for determining whether a contract is clear is the text of the document itself; when an instrument is unambiguous its construction and legal effect will be based upon what is found within the four corners of the instrument).
As noted above, nothing in the contract allowed for a conditional termination or for a conversion of a termination for convenience to a termination for cause. Therefore, in light of the unambiguous terms of the contract, we hold that the PBA cannot convert its termination for convenience to a termination for cause.
Also significant to our determination that the PBA's termination for convenience cannot be converted to a termination for cause is the language used in the sections of the contract providing for termination by the owner, i.e., the PBA. Section 12.2 of the contract sets forth the alternative ways the PBA may cancel the contract. Section 12.2.1 of the contract allows the PBA to cancel the contract for convenience but gives no right to the PBA to convert such a termination to one for cause. Section 12.2.2 of the contract, on the other hand, allows the PBA to cancel the contract for cause and explicitly grants the PBA the right to later convert such a termination to one for convenience if "a [c]ourt of competent jurisdiction" subsequently determines that the termination was without cause.
The legal maxim expressio unius est exclusio alterius (the expression of one thing is the exclusion of another) is frequently applied to aid courts in interpreting statutory language, and it is useful in this instance to interpret the language of the contract at issue here. See Bon Aventure, L.L.C. v. Craig Dyas, L.L.C., 3 So.3d 859, 866 (Ala.2008) (Lyons, J., concurring in the result). Here, the PBA drafted the contract and gave itself the right in § 12.2.2 of the contract to convert a termination for cause to one for convenience. However, the PBA did not grant itself the same right in § 12.2.1 of the contract. The fact that the right to convert is included in § 12.2.2 of the contract, but not in § 12.2.1 of the contract, leads us to conclude a more restrictive boundary was intended in § 12.2.1, the provision under which the contract was terminated. For this reason as well, we answer the certified question of law in the negative; the PBA could not have converted its termination for convenience to one for cause absent contractual language granting it the right to do so. Therefore, we affirm the trial court's order dated December 9, 2008, to the extent that it denied the PBA's motion to alter, amend, or vacate the trial court's summary judgment in favor of Dawson based on its finding that the contract was terminated for convenience.
The PBA also argues that a summary judgment in favor of Dawson was inappropriate because, it says, genuine issues of material fact exist. However, this case is before this Court on permissive appeal pursuant to Rule 5. Therefore, the only issue before this Court is the question of law certified by the trial court. The PBA's argument is not properly before this Court and will not be addressed.

III. Cases no. 1080737 and no. 1080738
Pursuant to Rule 5(a), Ala. R.App. P., the trial court certified the following question of law in its certification for permissive appeal in cases no. 1080737 and no. 1080738:
"Whether Dawson has any remaining legal obligations owing to the PBA under *182 Section 5.3 of the contract between them if the contract is deemed to have been terminated for convenience."
Dawson, as the appellant, argues that § 5.3 of the contract does not survive the termination of the contract under § 12.2.1 because § 12.2.1 unambiguously terminates the contract and exclusively governs any obligation the parties have to one another following such termination. We agree.
Applying the principles of contract interpretation discussed earlier, it is clear from the plain language of the contract that § 5.3 does not survive the PBA's termination of the contract for convenience. In its entirety, § 12.2.1 provides:
"12.2.1.1 The Owner [the PBA] may for any reason whatsoever terminate performance under this Contract by the Contractor [Dawson] for convenience. The Owner shall give written notice of such termination to the Contractor specifying when termination becomes effective.
"12.2.1.2 The Contractor shall incur no further obligations in connection with the Work and the Contractor shall stop Work when such termination becomes effective. The Contractor shall also terminate outstanding orders and subcontracts. The Contractor shall settle the liabilities and claims arising out of the termination of subcontracts and orders. The Owner may direct the Contractor to assign the Contractor's right, title and interest under terminated orders of Subcontracts to the Owner or its designee.
"12.2.1.3 The Contractor shall transfer title and deliver to the Owner such completed or partially completed Work and materials, equipment, parts, fixtures, information and Contract rights as the Contractor has.
"12.2.1.4 (a) The Contractor shall submit a termination claim to the Owner and the Architect specifying the amounts due because of the termination for convenience together with costs, pricing or other data required by the Architect. If the Contractor fails to file a termination claim within one (1) year from the effective date of termination, the owner shall pay the Contractor, an amount derived in accordance with subparagraph (c) below.
"(b) The Owner and the Contractor may agree to the compensation, if any, due to the Contractor hereunder.
"(c) Absent agreement to the amount due to the Contractor, the Owner shall pay the Contractor the following amounts:
"(i) Contract prices for labor, materials, equipment and other services accepted under this Contract
"(ii) Reasonable costs incurred in preparing to perform and in performing the terminated portion of the Work, and in terminating the Contractor's performance, plus a fair and reasonable allowance for overhead and profit thereon (such profit shall not include anticipated profit or consequential damages); provided however, that if it appears that the Contractor would have not profited or would have sustained a loss if the entire Contract would have been completed, no profit shall be allowed or included and the amount of compensation shall be reduced to reflect the anticipated rate of loss, if any;
"(iii) Reasonable costs of settling and paying claims arising out of the termination of subcontracts or orders pursuant to Subparagraph 12.2.1.2 of this Paragraph. These costs shall not include amounts paid in accordance with other provisions hereof.

*183 "The Total sum to be paid the Contractor under this Subparagraph 12.2.1 shall not exceed the total Contract Price, as properly adjusted, reduced by the amount of payments otherwise made, and shall in no event include duplication of payment."
Section 12.2.1 clearly sets forth the method by which final payment is to be made to Dawson for the work it completed under the contract before the PBA's termination for convenience.
Further, when § 5.3 is read in the context of the article in which it is found, Article 5, it is clear that § 5.3 is an interim-payment mechanism to be used during the life of the contract. Section 5.2 of the contract requires the contract price to be paid through a series of "progress payments." Section 5.3 allows the progress payments to be modified. Specifically, § 5.3 provides:
"5.3.1 The Owner may decline to make payment, may withhold funds, and, if necessary, may demand the return of some or all of the amounts previously paid to the Contractor, to protect the Owner from loss because of:
"(a) defective Work not remedied by the Contractor nor, in the opinion of the Owner, likely to be remedied by the Contractor.
"(b) the quality of a portion, or all, of the Contractor's work not being in accordance with the requirements of this Contract.
"(c) the quantity of the Contractor's work not being as represented in the Contractor's Application for Payment.
"(d) claims made or likely to be made by third parties against the Owner or the Owner's property.
"(e) failure by the Contractor to use Contract funds, previously paid the Contractor by the Owner, to pay Contractor's work related obligations including Subcontractors, laborers, materialmen, material and equipment suppliers or others in a prompt and proper fashion.
"(f) evidence that the balance of the Work cannot be completed in accordance with the Contact for the unpaid balance of the Contract Price.
"(g) evidence related to the Contractor's rate of Progress which in the Owner's opinion indicates that the Work will not be completed in the time required for substantial or final completion.
"(h) the Contractor's persistent failure to carry out the Work or refusal to perform any of its obligations in accordance with the Contract.
"(i) damage or loss caused by the Contractor or a Subcontractor, materialman, laborer, or supplier to the Owner or a third party to whom the Owner is, or may be, liable.
"In the event that the Owner makes written demand upon the Contractor for amounts previously paid by the Owner as contemplated in this Subparagraph 5.3.1, the Contractor shall promptly comply with such demand."
Later in Article 5, § 5.7, entitled "Completion and Final Payment," makes clear that § 5.3 is to be applied only during the life of the contract and alters the final payment amount only if the final payment is made pursuant to § 5.7. Section 5.7.5 states that "[t]he Owner shall make final payment of all sums due the Contractor subject to [§ ] 5.3.1." When § 5.3 is analyzed within the context of Article 5 it is clear that § 5.3 is an interim-payment mechanism that may affect § 5.7 alone. However, § 5.3 has no effect on the final payment due under §§ 12.2.1 and 12.2.2; thus, it is not necessary to look to § 5.3 because § 12.2.1.4 governs.
*184 Our holding is further bolstered by the fact that the PBA did not include in § 5.3 of the contract any language indicating that that section would survive a termination for convenience. However, in § 12.2.2.2 of the contract, the PBA did include a clause indicating that that section of the contract would survive the termination of the contract:
"12.2.2.2 If the unpaid balance of the Contract Price exceeds the cost of finishing the work, including compensation for the Owner's and the Architect's additional services and expenses made necessary thereby, such excess shall be paid to the Contractor. If such costs exceed the unpaid balance, the Contractor shall pay the difference to the Owner. This obligation for payment shall survive the termination of the Contract."
(Emphasis added.) Therefore, we must conclude that had the PBA intended for § 5.3 to survive termination of the contract it would have so stated, as it did in § 12.2.2.2 of the contract.
We answer the question certified by the trial court in the negative; § 5.3 of the contract did not survive the PBA's termination for convenience. Therefore, we reverse the trial court's judgment to the extent that it held that § 5.3 survived the termination of the contract.

IV. Case no. 1081297
Pursuant to Rule 5(a), Ala. R.App. P., the trial court certified the following question of law in its certification for permissive appeal in case no. 1081297:
"Does the economic loss doctrine, first recognized in Alabama in Lloyd Wood Coal Co. v. Clark Equipment Co., 543 So.2d 671 (Ala.1989), a product liability case, also apply in the context of a commercial construction dispute so as to preclude the [PBA], as the owner of the subject property, from asserting tort claims against various subcontractors given that the only damage claimed to have resulted from any defective conditions allegedly caused by the subcontractors was to the property itself?"
The economic-loss rule "prevents tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage to any property other than itself." Vesta Fire Ins. Corp. v. Milam & Co. Constr., 901 So.2d 84, 106-07 (Ala.2004). However, the economic-loss rule does not prevent a tort action when the injury caused is personal or is to property other than the complained-of product. See Lloyd Wood Coal Co. v. Clark Equip. Co., 543 So.2d 671, 674 (Ala.1989) (adopting the reasoning of East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)).
In denying the subcontractors' summary-judgment motion, the trial court properly recognized that this Court has not applied the economic-loss rule to bar a tort claim in a commercial-construction context. Rather, as the trial court held,
"the Supreme Court of Alabama appears to have instead focused on whether there exists a duty from which a tort might arise in a construction context. See, e.g., RaCON, Inc. v. Tuscaloosa County, 953 So.2d 321 (Ala.2006); Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496 (Ala.1984)."
Berkel & Co. Contractors, Inc., 454 So.2d 496 (Ala.1984), provides clear legal precedent concerning the situation presented by the certified question; thus, we see no reason to apply the economic-loss rule to bar tort claims in a commercial-construction context.
In RaCON, Inc. v. Tuscaloosa County, 953 So.2d 321 (Ala.2006), we applied Berkel to determine whether one party had a duty in tort to another in a commercial-construction *185 context. In RaCON, a county undertook a project to extend a road. The county hired a project engineer, Burk-Kleinpeter, Inc. ("BKI"), which retained a consultant, TTL, Inc., "to perform consulting services for BKI on soil or other geotechnical conditions along the proposed roadway." 953 So.2d at 323. TTL provided studies that BKI used in developing the bid package for the project. Based on TTL's studies, the bid package indicated that "rock buttresses might be required by BKI on the project." 953 So.2d at 325. RaCON, Inc., submitted a bid for the project. RaCON alleged that,
"prior to bidding, [a RaCON representative] had conversations with Jeff Wood of BKI and Jim Bamberger of TTL in which both Wood and Bamberger allegedly assured [the representative] that (a) ALDOT specification 219[[3]] applied to the project; (b) RaCON's interpretation of ALDOT specification 219, i.e., that rock buttresses were intended as remedial, not preventive, structures to correct actual slope failures, was accurate; and (c) rock buttresses would be required only as a last resort on the project if less costly measures (e.g., installation of above ground or subsurface drainage systems) failed to correct a landslide."
953 So.2d at 325. As a result, RaCON did not include the cost of constructing rock buttresses in its final bid "because it was willing to take a commercial risk that there would be no slope failures on the project that would require" the construction of rock buttresses. 953 So.2d at 325. RaCON was awarded the project and contracted with the county.
Three slope failures occurred during RaCON's preliminary construction work. As a result of the slope failures, which RaCON alleged it remedied by installing underground drains, RaCON was furnished with designs by TTL for the rock buttresses to be constructed. RaCON constructed the rock buttresses under protest, claiming that the construction of the rock buttresses was extra work not contemplated under the contract. RaCON later sued TTL, among others, alleging negligence and seeking damages resulting from its work on the project. TTL moved for a summary judgment, which the trial court granted, finding that TTL owed no duty to RaCON.
On appeal, in considering whether TTL owed RaCON a duty for purposes of its negligence claim, we stated:
"RaCON and TTL acknowledge that this Court has rejected the absence of privity of contract as a defense to a negligence claim against a party to a construction project. Berkel & Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496, 501 (Ala.1984). This Court held in Berkel that a subcontractor retained by the general contractor to install foundational pilings for a building could assert a negligence claim against the owner, Providence Hospital, for expenses incurred by the subcontractor in performing that work. 454 So.2d at 503. The Berkel Court noted six factors that should be analyzed to determine whether a party not in privity with the claimant owes the claimant a duty of care in a construction setting. Those six factors are as follows:
"`"`(1) [T]he extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the *186 closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm.'"'
"454 So.2d at 503 (quoting Howe v. Bishop, 446 So.2d 11, 15 (Ala.1984) (Torbert, C.J., concurring in the result), quoting in turn United Leasing Corp. v. Miller, 45 N.C.App. 400, 406-07, 263 S.E.2d 313, 318 (1980))."
RaCON, 953 So.2d at 334-35. Applying the Berkel factors to the facts in RaCON, we held that TTL did not owe RaCON a duty of care, and, thus, we affirmed the trial court's judgment granting TTL's summary-judgment motion.
The same analysis and factors derived from Berkel and applied in RaCON apply in the present case, obviating any need to apply the economic-loss rule in a commercial-construction context. Rather, our focus is on whether the claimant was owed a duty by the party he is suing, as demonstrated by the trial court's following holding:
"From [Berkel] comes a number of factors to be considered in deciding whether to impose a duty in a construction context. Those factors lead to the necessity of conducting a fact-intensive inquiry. At this juncture, the Court cannot conclude that the movants are entitled to a judgment as a matter of law. Rather, further evidence regarding the parties' relationships is needed before the Court can comfortably address the matter."
Therefore, we answer the certified question in the negative and affirm the trial court's judgment denying the subcontractors' summary-judgment motion concerning the PBA's tort claims against them.

Conclusion
Based on the foregoing, we affirm the trial court's judgments in cases no. 1080733, no. 1080734, no. 1080735, no. 1080736, and no. 1081297, and we reverse the trial court's judgments in cases no. 1080737 and no. 1080738 and remand the cases.
1080733AFFIRMED.
1080734AFFIRMED.
1080735AFFIRMED.
1080736AFFIRMED.
1080737REVERSED AND REMANDED.
1080738REVERSED AND REMANDED.
1081297AFFIRMED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., dissents.
MURDOCK, Justice (dissenting).
I disagree with the interpretation of § 12.2.1.2 of the contract set out in the main opinion and the corollary holding that § 5.3 does not apply in this case.
The language of § 12.2.1.2 of the contract bears repeating:
"12.2.1.2 The Contractor shall incur no further obligations in connection with the Work and the Contractor shall stop Work when such termination becomes effective. The Contractor shall also terminate outstanding orders and subcontracts. The Contractor shall settle the liabilities and claims arising out of the termination of subcontracts and orders. The Owner may direct the Contractor to assign the Contractor's right, title and *187 interest under terminated orders of Subcontracts to the Owner or its designee."
(Emphasis added.)
The first clause of the first sentence of this section is not a provision relieving the contractor of any liability or responsibility under the contract; rather, it is a directive to the contractor that, if and when the owner invokes its right to terminate the contract for reasons other than for cause, the contractor is not to incur any "further" obligations beyond those to which it has already committed itself. In other words, it is a command to the contractor to cease and desist from entering into any new or additional commitments to subcontractors and suppliers. This, in my view, is simply a plain reading of the language in this clause.
"`General contract law requires a court to enforce an unambiguous, lawful contract, as it is written. P & S Business, Inc. v. South Central Bell Telephone Co., 466 So.2d 928, 931 (Ala.1985). See also McDonald v. U.S. Die Casting & Development Co., 541 So.2d 1064 (Ala.1989). A court may not make a new contract for the parties or rewrite their contract under the guise of construing it. Estes v. Monk, 464 So.2d 103 (Ala.Civ.App. 1985)....'"
Dawkins v. Walker, 794 So.2d 333, 339 (Ala.2001) (quoting Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 35-36 (Ala. 1998)). Furthermore, it is a reading of this language that is in pari materia with the remainder of the first sentence, which commands that "the Contractor shall stop Work" upon a termination for convenience. See Celtic Life Ins. Co. v. McLendon, 814 So.2d 222, 224 (Ala.2001) (noting that contracts "`are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions'" (quoting Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C., 703 So.2d 866, 870 (Ala.1996) (emphasis omitted))); Sullivan, Long & Hagerty v. Southern Elec. Generating Co., 667 So.2d 722, 725 (Ala.1995) ("Terms of a written instrument should be construed in pari materia...."). Similarly, it is a reading that is consistent with the next sentence of § 12.2.1.2, which requires the contractor to "terminate outstanding order and subcontracts." See id.
Consistent with this understanding, I see nothing that prohibits the Public Building Authority of the City of Huntsville ("the PBA") from terminating the contract "for convenience," subsequently discovering or making a determination that a termination for cause is warranted, and then acting on that discovery or determination. A fortiori, the PBA could terminate for conveniencethereby halting any "further" work by the contractor while expressly reserving any claims against the contractor for defective work or, as it chose to do here, expressly reserving its right to thereafter assess the work that had been done by the contractor and subsequently terminate for cause if a termination for cause is found to be warranted.
I also disagree with the treatment as tort claims claims that are merely breach-of-contract claims against the subcontractors and the majority's decision not to apply the economic-loss rule to those claims.
NOTES
[1] On December 13, 2006, Dawson was voluntarily dismissed from the PBA's action.
[2] The PBA quotes the following from Accent Builders as the "two-part" test:

"[T]he question for the jury was not whether Accent intended to terminate for convenience, but instead whether it acted in bad faith or whether Southwest changed its position in reliance. Absent a finding on one or both of these issues, Accent was entitled as a matter of law to its issues pertaining to termination for cause."
679 S.W.2d at 110.
[3] ALDOT specification 219.203(a) provides that the work needed to correct a landslide varies based on the site conditions. Construction of a rock buttress is one of several methods discussed in ALDOT specification 219.203(a) to correct landslides.