Rel: June 21, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

### SC-2023-0250

_____

## Alabama Plating Technology, LLC

### v.

## Georgia Plating Technology, LLC; DVEST, LLC; and Jin Kim

### Appeal from Chambers Circuit Court
### (CV-20-900101)

_____

### SC-2023-0271

_____

**Georgia Plating Technology, LLC; DVEST, LLC; and Jin Kim**

v.

**Alabama Plating Technology, LLC**

**Appeal from Chambers Circuit Court**
**(CV-20-900101)**

COOK, Justice.

These appeals arise out of a contractual dispute regarding an asset-purchase agreement for a brake-plating plant in Lanett. The agreement at issue is between the sellers of that plant -- Georgia Plating Technology, LLC ("GPT"), DVEST, LLC ("DVEST"), and Jin Kim -- and the buyer -- Alabama Plating Technology, LLC ("APT").

Several months after the purchase, APT provided notice to the sellers of various indemnity claims that fall into three categories: (1) environmental issues, (2) unpaid accounts payable, and (3) certain inoperable assets. According to APT, those claims arise from retained liabilities of and/or breaches of warranties by the sellers. After a series of disagreements between the parties ensued over the next several months, APT eventually decided to set off its losses arising from those claims against the annual installment payments it had previously agreed

to pay the sellers.

The sellers filed suit against APT and its parent corporation, alleging, among other things, breach of contract because of the setoff. APT countersued. The trial court found for APT regarding two of the three issues presented by the parties' claims -- specifically, its environmental-issues and unpaid-accounts-payable claims -- but found for the sellers regarding APT's inoperable-assets claim. The trial court also rejected APT's claim for attorneys' fees and legal expenses. Both sides appeal.

As explained below, in APT's appeal -- appeal no. SC-2023-0250 -- we reverse the portion of the trial court's judgment denying APT relief on its inoperable-assets claim. We also reverse the trial court's denial of APT's claim for attorneys' fees and legal expenses and remand the case to the trial court for proceedings consistent with this Court's analysis of that issue. Additionally, in the sellers' cross-appeal -- appeal no. SC-2023-0271 -- we affirm the portion of the trial court's judgment granting APT relief on its environmental-issues and unpaid-accounts-payable claims as well as the trial court's denial of the sellers' request to accelerate the remaining installment payments owed to them by APT.

Facts and Procedural History

In 2014, Kim, as the owner and president of DVEST, established GPT for the purpose of owning and operating a brake-plating facility in Lanett that supplied brake plates to its only customer -- Mando America Corporation ("MAC"), APT's parent company. Shortly after beginning to operate the plant, GPT and DVEST began to face financial difficulties.

As a result of those financial difficulties, at the end of 2018, GPT, through Kim, and MAC, through its owner Mando Korea, began negotiations to purchase GPT and DVEST's assets. Shortly thereafter, in January 2019, Kim and Mando Korea agreed that MAC would purchase GPT and DVEST's assets for $11.06 million.

I. The Asset-Purchase Agreement

In March 2019, before the acquisition was finalized, MAC formed APT as a subsidiary for the purpose of purchasing GPT and DVEST's assets. APT's acquisition of GPT and DVEST's assets was finalized on April 1, 2019.[1] At that time, an asset-purchase agreement ("the APA")

---

[1]The parties expressly agreed in § 3.1 of the asset-purchase agreement that "Closing" was scheduled to take place on April 1, 2019, and that the phrase "Closing Date" would refer to that date. The parties do not dispute that the asset-purchase agreement was dated, signed, and effective as of April 1, 2019.

and a promissory note ("the Note") were executed by the parties.[2]

Under the APA, APT agreed to pay GPT and DVEST $11.06 million for the real property, the building, and the tangible personal property related to the brake-plating facility owned by GPT and DVEST in Lanett. Under the Note, APT agreed to pay GPT and DVEST $7,060,000 at closing and $400,000 in annual installment payments. Those installment payments were to be paid beginning on June 30, 2020, and continuing until June 30, 2029.

GPT and DVEST in turn agreed to retain certain liabilities. Those liabilities included, in relevant part: (1) "all liabilities … of any nature whatsoever," "including liabilities, obligations or commitments in respect to environmental matters" "which arose or were incurred on or before the Closing Date," § 2.3(c) of the APA (emphasis added); (2) "all liabilities … under any Environmental Law," § 2.3(g) of the APA (emphasis added); (3) "all Accounts Payable," § 2.3(k) of the APA (emphasis added); and (4)

---

[2]Under the APA, APT was listed as the buyer of the assets, GPT and DVEST were listed as the sellers of the assets, and Kim was listed as the equity owner of GPT and DVEST.

Under the Note, APT was listed as the borrower and MAC was listed as the guarantor. GPT and DVEST were listed as the lenders.

5

"[a]ll liabilities … relating to or arising out of the Purchased Assets …."

§ 2.3(l) of the APA (emphasis added).

GPT and DVEST also made certain representations and warranties in the APA. Those representations and warranties included: (1) that "[a]ll of the Tangible Personal Property is in satisfactory condition and is suitable for the purpose for which it is being used," § 4.7 of the APA (emphasis added); (2) that "Sellers and [their] assets are and ... at all times have been in compliance with all Laws," § 4.11 of the APA (emphasis added); (3) that "Sellers have been and [are] in compliance with all Governmental Authorizations required for [them] to conduct Business ….," § 4.14 of the APA (emphasis added); (4) that "[attached] Schedule 4.17 contains a true and complete list of all accounts payable of Sellers as of the close of business two days prior to the Closing Date," § 4.17 of the APA (emphasis added); (5) that "[t]here has never been any Hazardous Material used, handled, manufactured, generated, produced, stored, treated, processed[,] transferred, or disposed of by Sellers," § 4.20(a) of the APA (emphasis added); and (6) that "[t]he activities, operations and business of Sellers have been at all times carried out in compliance with all Environmental Laws. No further action is required

to remedy any Environmental Condition or violation of, or to be in full compliance with, any Environmental Laws," § 4.20(b) of the APA (emphasis added).

The APA further made clear that GPT, DVEST, and Kim "<u>shall indemnify</u>" APT for "all Losses" incurred "in connection with" "<u>any Retained Liability</u>" or "<u>breach of any representation or warranty</u>." § 11.2 of the APA (emphasis added).

As explained below, the APA also contained provisions addressing a variety of procedural issues, including: (1) the process for notice, objection, and resolution of any claims for indemnity and (2) when APT was entitled to set off any losses it had incurred relating to indemnification against the remaining $400,000 annual installment payments it owed under the Note.

II. <u>The Parties' Actions Before Closing</u>

Before closing, GPT asked one of its vendors, JP Technology, Ltd., to prepare a quote to repair certain equipment on one of the brake-plating plant's two brake lines.

Shortly thereafter, APT conducted a "due diligence" inspection of GPT's plant and other assets to be purchased. A day after the inspection

took place, APT received a written report of the investigator's findings. That report classified the assets as being in "good condition" at the time of the inspection. However, the report expressly noted that the "intended use" of the inspection was to evaluate the assets to determine their "value" and noted that the inspector "did not physically measure equipment capacities or test equipment condition" to reach his conclusion.

On January 7, 2019, the Alabama Department of Environmental Management ("ADEM") issued a "notice of violation" to GPT. In that notice, ADEM notified GPT that the plant's water-storage system was in violation of the "State Indirect Discharge" ("SID") permit previously issued to GPT by ADEM. That "notice of violation" was attached to the APA as Schedule 4.20(c).

In March 2019, GPT hired a vendor -- Ken & OS, Inc. ("Ken & OS") -- to prepare a plan to remedy the SID-permit violation. The plan was then sent to ADEM by Ken & OS on behalf of GPT and Kim. In that plan, Ken & OS represented to ADEM that it had submitted its plan to GPT's management on March 9, 2019, and that GPT had told Ken & OS that it would "follow [and] take action based on this rationale." According to the

8

materials in the record, although Ken & OS began working on making the required changes before the closing date, it did not finish the work before closing occurred.

III. After Closing

Per the terms of the APA, on April 1, 2019, the parties closed on APT's acquisition of GPT and DVEST's assets. A week later, APT received the quote from JP Technology -- GPT's vendor -- for the cost to repair or replace the parts on brake line two, including (1) an ultrasonic system, (2) a hot-air dryer, (3) a "ZoNi Brightener metering pump," (4) "ZoNi Plating Bath pH controller," (5) a "Chromate Bath pH controller," and (6) a geared motor. In light of, among other things, the information it received from JP Technology's quote and the employees who had previously been employed by GPT, APT determined that several "Purchased Assets" -- that is, parts of brake line two -- were in "inoperable" condition.

APT also discovered that GPT had failed to finish remediation of the ADEM SID-permit violation, despite Ken & OS's representation to ADEM that GPT would "take action" to complete the remediation plan sent to ADEM on GPT's behalf.

On April 25, 2019, APT also received a new "notice of violation" from ADEM, which stated that, during its preclosing inspection of GPT's plant in March, ADEM had determined that GPT was also creating and storing hazardous wastes without a permit.

In the weeks and months following closing, APT also received several notices and invoices from various vendors of unpaid accounts payable -- some of which were listed in a schedule attached to the APA and some of which were not -- claiming that the accounts remained unpaid for items purchased or services rendered before the date of closing. According to APT, it notified the vendors that GPT, not APT, was responsible for paying the accounts because the services had been rendered or the items had been purchased while GPT was the owner and operator of the plant.  Despite that information, the vendors continued to send notices and invoices to APT because they were unable "to get in touch" with GPT.

IV.  APT's First "Claim Notice"

On August 7, 2019, four months after the parties closed on the sale by executing the APA and the Note, APT's attorney sent a 68-page letter to Kim titled "Claim Notice for Indemnification" via certified mail (the

10

"first 'Claim Notice'"). In that first "Claim Notice," APT alleged that GPT and DVEST had breached multiple express warranties, representations, and covenants as a result of the inoperable assets, the ADEM violations, and the unpaid accounts payable and provided an explanation for each.

APT also stated in its first "Claim Notice" that, if GPT and DVEST refused or failed to resolve the breaches asserted therein, APT would be allowed to resolve the breaches itself. Specifically, APT asserted that GPT and DVEST would be required to indemnify APT under § 11.2 of the APA for all "Losses" APT incurred relating to (1) the remediation of the ADEM SID-permit violation, (2) the remediation of the ADEM hazardous-waste violation, (3) the repair or replacement of the "inoperable assets," and (4) the payment of GPT's unpaid accounts payable.

In the first "Claim Notice," APT notified GPT and DVEST of the following estimated "Losses" related to its indemnity claims:

| Matter | Current Balance |
|---|---|
| ADEM SID-Permit Violation<br><br>- Cost of Implementing Remedial Measures | $104,384.60 |

| ADEM Hazardous-Waste Violation and Hazardous-Waste Proposed Administrative Order | TBD |
|---|---|
| Inoperable Assets<br><br>- Cost of Asset Repair/Restoration | $105,430.00 |
| Accounts Payable<br><br>- Cost of Undisclosed or Unpaid Accounts Payable | $11,542.11 |
| TOTAL | TBD |

APT's first "Claim Notice" also notified GPT and DVEST that if they did not send "written notice of any good faith objection in reasonable detail to APT in connection with this Claim Notice" within 20 days of its receipt, it would be "presumed and deemed that [GPT and DVEST] acknowledge and agree to indemnify APT and that the Liability Claim balance is immediately payable" pursuant to § 11.5 of the APA. (Emphasis added.) The first "Claim Notice" also notified GPT and DVEST, however, that "APT has the right" under § 11.7 of the APA "to send a final set off notice to [GPT and DVEST] and immediately set off the amount[s] that APT claims in good faith are owed to APT by [GPT and DVEST]" if the parties "are unable to resolve any dispute with respect to the Claim Notice within sixty (60) days after initial receipt of

such notice by [GPT and DVEST]." (Emphasis added.)

APT attached a number of documents to its first "Claim Notice," including: (1) ADEM's "notice of violation" of the SID permit; (2) GPT's response to ADEM regarding the SID-permit "notice of violation"; (3) the invoices for the work performed before closing by third-party vendors to remedy the SID-permit violation; (4) ADEM's "notice of violation" for the hazardous waste; (5) ADEM's proposed order regarding the hazardous-waste violation; (6) a copy of Schedule 4.7 attached to the APA, which was the list of purchased assets; (7) a list of the inoperable parts and the estimated cost to repair or replace the parts from the JP Technology quote requested by GPT before closing and received by APT after closing; (8) pictures of the purported inoperable parts; (9) a copy of Schedule 4.17 attached to the APA, which provided the list of the unpaid accounts payable that existed at the time of closing; and (10) copies of the invoices for unpaid accounts payable that were not included in Schedule 4.17 but were obtained by GPT before closing and remained unpaid after closing.

V. GPT's Response to APT's First "Claim Notice"

On August 13, 2019, Kim received APT's first "Claim Notice." Thirteen days later, on August 26, 2019, Kim responded to APT's first

"Claim Notice" by sending an email to APT's attorney. That email provided as follows:

> "As per your claim notice letter that I received via first class mail on Aug. 13th, 2019, I am contacting lawyer for my side and will get back to you in a month or so.
>
> "Before my lawyer contact[s] you, I would like to declare my opposition to your insists [i]n the letter as below;
>
> "1. Page 7 'Notice' 1st paragraph
>
>> "'Note that if within twenty (20) days after the receipt of this Claim Notice, Sellers have not given written notice of any good faith objection in reasonable detail to APT in connection with this Claim Notice, then it shall be presumed and deemed that Sellers acknowledge and agree to indemnify APT and that the Liability Claim balance is immediately payable.'
>
> "2. Page 7 'Notice' 2nd paragraph
>
>> "'If APT and Sellers are unable to resolve any dispute with respect to the Claim Notice within sixty (60) days after initial receipt of such notice by Sellers, APT has the right to send a final set off notice to Sellers and immediately set off the amount[s] that APT claims in good faith are owed to APT by Sellers.'"

On September 4, 2019 -- 22 days after he received APT's first "Claim Notice" -- Kim sent APT an additional response by letter. In that letter, Kim stated only the following:

14

"I have now had an opportunity to review your letter of August 7, 2019 with my attorney. Each and every issue [which] your client complains of your client was made fully aware of prior to the April 1, 2019 closing. For your client to claim otherwise is false and [its] claim for indemnification is made in bad faith and contrary to the facts. I fully dispute each and every claim set forth in your letter.

"However, I intend to engage in good faith negotiations as required by the [APA]. I began that process by meeting with the Mando CFO yesterday. Please also direct your future correspondence to both my attention and that of my closing attorney, Thomas M Eden, III. In fact, I was shocked that he was not included on your August 7, 2019, letter since your firm was well aware that he acted as my closing attorney."

VI. <u>APT's Second "Claim Notice"</u>

On December 31, 2019, APT, through its attorney, sent a second letter to Kim, titled "Claim Notice for Indemnification" (the "second 'Claim Notice'"). In that second "Claim Notice," APT "renew[ed] and incorporate[d] its August 7, 2019 Claim Notice by reference" and demanded indemnity from GPT and DVEST for costs relating to (1) the remediation of the ADEM SID-permit violation, (2) the remediation of the ADEM hazardous-waste violation and in compliance with a consent order APT had entered into with ADEM, (3) the repair of the inoperable assets, and (4) the payment of GPT's unpaid accounts payable. APT also asserted new breach-of-contract and indemnity claims for the costs

relating to a National Pollutant Discharge Elimination System ("NPDES") industrial general permit.

At the time APT sent its second "Claim Notice," APT claimed that its estimated "Losses" included the following:

| Matter | Current Balance |
|---|---|
| Cost of Implementing Remedial Measures Necessitated By the ADEM SID-Permit Violation | $141,759.15 |
| Cost of Implementing Remedial Measures Necessitated By the ADEM Hazardous-Waste Notice of Violation and Hazardous-Waste Consent Order | TBD but in no event less than $54,566.92 |
| Cost of Repair/Restoration of Inoperable Assets | $188,870.20 |
| Cost of Undisclosed and Unpaid Accounts Payable | $32,745.27 |
| Cost of the NPDES Permit | $3,967.00 |
| TOTAL | $421,908.54 |

Among other things, APT attached to its second "Claim Notice" the following exhibits: (1) a copy of the first "Claim Notice" from August, including all exhibits originally attached to that notice; (2) invoices for

16

the cost to complete the remediation plan GPT sent to ADEM regarding the SID-permit violation; (3) a copy of the ADEM consent order regarding the hazardous-waste violation that APT had agreed to on September 20, 2019; (4) invoices for the cost to comply with the ADEM consent order regarding the hazardous-waste violation; (5) updated invoices for the cost to repair or replace the inoperable assets identified in the first "Claim Notice"; (6) invoices from the vendors in Schedule 4.17 attached to the APA that had remained unpaid 30 days after closing but that APT had paid on or after September 9, 2019; and (7) invoices for the cost to obtain an NPDES permit.

VII. GPT's Response to APT's Second "Claim Notice"

Seventeen days later, on January 17, 2020, GPT and DVEST, through their attorney, sent a letter to APT's attorney titled "GPT Dispute of Notice for Indemnification." In that letter, GPT and DVEST asserted that the APA was "based on 'AS IS' condition." They also asserted, for the first time, a long list of objections to the breaches that APT had listed in its first "Claim Notice" from August 2019. The principal objection raised was that both of APT's "Claim Notices" were untimely and that APT had known of all of the alleged breaches before the closing

date. GPT and DVEST did not address or specifically object to the newest breach listed in APT's second "Claim Notice" concerning the NPDES permit.

VIII. The First, Second, and Third Installment Payments Owed by APT under the APA and the Note

Before the first installment payment became due on June 30, 2020, APT, through its attorney, sent a third letter to Kim, titled "APT's Notice of Set Off," on April 28, 2020. In that letter, APT claimed that it was entitled to set off its entire first $400,000 annual installment payment because, it alleged, GPT and DVEST "have failed or refused to satisfy their obligations under the APA and Claim Notices, and APT has suffered 'Losses' … of at least $540,366.15." Specifically, APT asserted that it had sustained the following "Losses":

"$144,153.96 in implementing remedial measures to address the ADEM SID Permit Notice of Violation; $137,114.85 in implementing remedial measures to address the ADEM Hazardous Waste Notice of Violation and Hazardous Waste Consent Order; $185,532.07 in repairing or restoring Inoperational Assets; $32,708.27 in paying Undisclosed or Unpaid Accounts Payable; $3,857.00 in obtaining the NPDES Industrial General Permit; and $37,000.00 in Legal Fees and Expenses."

GPT and DVEST did not respond to APT's April 28, 2020, notice of setoff. With no response from GPT and DVEST, APT sent a final notice

18

of setoff and allowed its first $400,000 annual installment payment to go completely unpaid.

While this litigation was pending, the second and third annual installment payments came due on June 30, 2021, and June 30, 2022, respectively.

For the second payment, APT sent Kim a notice of setoff on April 7, 2021, and a final notice of setoff on June 7, 2021. In those notices, APT asserted that "[t]he sum of the set off amount shall be (i) $140,366.15, the remaining balance from APT's 2020 Set Off Notices (defined below), plus (ii) all legal fees and expenses incurred up to the 2nd Installment Payment date." The trial court found that GPT and DVEST had not responded to either notice in a timely manner. Thus, when the second payment came due, APT set off $140,366.15 from the second annual installment payment.

For the third payment, APT sent GPT a notice of setoff on April 7, 2022, and a final notice of setoff on June 8, 2022. In those notices, APT asserted that it was entitled to set off "$51,647.52" from the third installment payment for "all legal fees and expenses incurred between the 1st and 3rd Installment Payment date." When GPT and DVEST

19

allegedly did not respond to APT's final notice of setoff in a timely manner, APT set off $51,647.52 from the third annual installment payment when that payment came due.

As shown in the chart below, in total, APT set off $592,013.67 from the first, second, and third annual installment payments owed to GPT and DVEST under the APA and the Note.

| Notice of Set-off | Specific Amount Claimed | Amount Set-off |
|---|---|---|
| Notice of Set-off for 1st Installment Payment | $540,366.15 for all "Losses" for which APT is entitled to indemnification, specifically:<br>1. $144,153.96 for ADEM SID-permit Violation<br>2. $137,114.85 for ADEM Hazardous-Waste Violation<br>3. $185,532.07 for Inoperable Assets<br>4. $32,708.27 for Unpaid Accounts Payable<br>5. $3,857.00 for NPDES Permit<br>6. $37,000 for Legal Fees and Expenses | $400,000 |
| Notice of Set-off for 2nd Installment Payment | $140,366.15 for all "Losses" that APT was entitled to set off under the first notice of setoff but were not covered by the first installment payment | $140,366.15 |
| Notice of Set-off for the 3rd Installment Payment | $51,647.52 for the legal fees and expenses APT had incurred from the 1st installment payment until the notice of setoff for the 3rd installment payment | $51,647.52 |

| Total | | $592,013.67 |
| --- | --- | --- |
| | | |

IX. The Underlying Lawsuit and the Trial Court's Judgment

On October 20, 2020, GPT, DVEST, and Kim sued APT and MAC for APT's failure to pay its first annual installment payment on June 30, 2020. In their complaint, they alleged, among others, claims of breach of contract under the APA and breach of contract under the Note. They also sought monetary damages and a judgment declaring that they were entitled to an acceleration of the remaining installment payments owed to them under the APA and the Note as a result of APT's alleged breaches.

In their answer, APT and MAC asserted counterclaims against GPT, DVEST, and Kim for GPT and DVEST's failure to indemnify APT. APT also sought a judgment declaring that it properly set off its losses related to its indemnity claims against the installment payments owed to GPT and DVEST under the APA and the Note. Finally, APT sought monetary damages for its claims as well as its attorneys' fees and legal expenses.

In November 2022, the trial court conducted a bench trial on all of

the parties' claims. Following the bench trial and posttrial briefing, the trial court issued a 10-page judgment in which it first noted that the case "primarily involved issues of retained liabilities, terms, and conditions of indemnification and rights of set off found in §§ 2.3, 11.5, and 11.7" of the APA.

The trial court explained that "Section 11.5 of the [APA] contains the general procedures … regarding claims for indemnification" and that "Section 11.5(a) sets forth the specific notice requirements … and Section 11.5(c) sets forth the specific response requirements …." Applying those provisions, the trial court then made the following findings.

### A. Environmental Issues

First, as to the environmental issues, the trial court found that "[t]he ADEM SID Permit Violations and Hazardous Waste Violations arose prior to the closing date and all parties were aware of the environmental issues on the closing date" and that "Sellers specifically retained all liabilities associated with environmental expenses …." As a result, the trial court determined that "APT provided Sellers with its notice of claim for indemnification for the environmental costs … within a reasonably practicable time from the date APT became aware of the full

22

scope of losses related to the GPT violations" and, thus, that "APT acted in compliance with Section 11.5(a) of the Agreement regarding these notices."

The trial court also found that, "although the emailed response from the Sellers was given within twenty (20) days in compliance with a portion of Section 11.5(c), Sellers failed to provide any detail at all regarding their objection." As a result, the trial court held that, "[b]ecause of Sellers' failure to respond with any detail at all, it is presumed and deemed that Sellers agreed to indemnify APT [regarding the environmental issues]. Kim's trial testimony is dispositive of this issue."[3]

### B. Unpaid Accounts Payable

As to the unpaid accounts payable, the trial court found (1) that "Sellers specifically retained all liabilities associated with Accounts Payable pursuant to Section 2.3"; (2) that APT provided notice on August 7, 2019, "as soon as [was] reasonably practicable"; and (3) that "[a]s discussed above Sellers' response … was insufficient." As a result, the

---

[3]Notably, the trial court also found that "that the environmental costs incurred by APT to correct the ADEM violations … were reasonable and necessary" and "that the Sellers would have been responsible for the environmental costs … even if the Sellers had responded in reasonable detail."

trial court concluded that GPT, DVEST, and Kim were "deemed to have acknowledged and agreed" to indemnify APT.

The trial court also found that, to the extent that APT's second "Claim Notice" contained additional unpaid-accounts-payable claims, GPT, DVEST, and Kim "specifically retained accounts payable" as a liability under the APA and "APT paid … said accounts following the closing." As a result, the trial court concluded that APTs "set off" for those unpaid accounts payable was "proper."

### C. Inoperable Assets

As to the inoperable assets, the trial court found "that APT knew of the condition of the assets …. However, APT waited four months until August 7, 2019 to" inform GPT, DVEST, and Kim about its concerns related to those inoperable assets via its first "Claim Notice." As a result, the trial court found that "APTs failure to notify Sellers as soon as is reasonably practicable regarding the issue of inoperable assets relieves Sellers of their obligation to indemnify under Section 11.5(a)."

Alternatively, the trial court also found that APT's claim regarding the inoperable assets failed because APT had conducted a due-diligence inspection under § 6.8 of the APA and had not raised any objection

24

regarding the inoperable assets before closing. Specifically, the trial court found that the APA gave APT "two options" to remedy the assets' allegedly inoperable conditions at the time of that inspection: "terminate the agreement" or "proceed to closing subject to an equitable adjustment in the Purchase Price." Because APT had failed to avail itself of one of those two options before closing, the trial court determined that APT was not entitled to relief on its inoperable-assets claim.

In sum, the trial court expressly found (1) that APT was entitled to succeed on its indemnity claims regarding the environmental issues and the unpaid accounts payable; (2) that APT was not entitled to succeed on its indemnity claim regarding the inoperable assets; and (3) that GPT, DVEST, and Kim were entitled to recover on their breach-of-contract claims to the extent that APT was not entitled to indemnification for the inoperable assets, but that GPT and DVEST were not entitled to accelerate the remaining installment payments owed under the Note because a portion of APT's setoff had been "proper."

### D. Attorneys' Fees and Legal Expenses

Finally, as to APT's request for the attorneys' fees and legal expenses that it had incurred both before and after litigation, the trial

court found that § 14.8 of the APA governed the resolution of that issue. Applying that provision to the facts and circumstances of the present case, the trial court specifically found:

> "Here, while the [APA] provides for the reimbursement of fees in the specific event that one party or the other prevails, it is silent regarding the award of legal fees in a split situation such as this where the parties have prevailed on certain claims and have not prevailed on others."

Accordingly, the trial court concluded that there was "no basis upon which to award attorneys' fees to [APT] who is both prevailing and non-prevailing under the terms of the [APA] ...."[4]

X.  The Present Consolidated Appeals

After the trial court entered its judgment, APT timely filed its appeal -- appeal no. SC-2023-0250. APT challenges the trial court's judgment in favor of GPT, DVEST, and Kim on APT's counterclaim for indemnification regarding the inoperable assets and its decision not to award APT its requested attorneys' fees and legal expenses.

GPT, DVEST, and Kim (hereinafter referred to collectively as

---

[4]The trial court also found that neither side was entitled to succeed on their remaining claims; however, on appeal, the parties do not challenge the trial court's decision as to those other claims.

"GPT") then filed a timely cross-appeal -- appeal no. SC-2023-0271. GPT challenges the trial court's judgment in favor of APT on APT's counterclaims for indemnification regarding the environmental issues and the unpaid accounts payable. It also challenges the trial court's decision not to accelerate any installment payments owed to it by APT under the APA and the Note.[5]

## Standard of Review

"When a trial court hears ore tenus testimony, '"its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust."' Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005) (citation omitted). But '"the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts."' Id.

---

[5]Notably, GPT also argues in its brief that we should reverse the trial court's decision in favor of MAC on its breach-of-contract claim based on MAC's alleged failure to comply with the terms of the Note. However, we cannot properly decide that issue because MAC is not a party to this appeal. MAC was not named as a party in APT's notice of appeal or in GPT's timely notice of cross-appeal. Under Rule 3(c), Ala. R. App. P., "[t]he notice of appeal shall specify all parties taking the appeal and each adverse party against whom the appeal is taken." (Emphasis added.) The Committee Comment to the Amendment to Rule 3(c) Effective January 1, 2017, makes clear that an appellant is "require[d]" to "specify by name all appellants and all appellees who are parties to the appeal" because the notice of appeal "is designed to eliminate any confusion as to the actual participants to the appeal and to ensure that a party's ability to file a cross-appeal is not impaired due to uncertainty or a lack of notice." (Emphasis added.)

(citation omitted). Further, '[i]f a contract can be interpreted without going beyond the four corners of the document, the trial court's resolution of the question of law is accorded no presumption of correctness, and this Court's review is <u>de novo</u>.' <u>Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.</u>, 986 So. 2d 1093, 1101 (Ala. 2007)."

<u>Lafayette Land Acquisitions II, LLC v. Walls</u>, [Ms. SC-2022-0765, Apr. 21, 2023] \_\_\_\_ So. 3d \_\_\_\_, \_\_\_\_ (Ala. 2023).

Discussion

APT's appeal and GPT's cross-appeal present three questions: (1) whether APT was entitled to indemnification under the APA for its claims concerning the inoperable assets, the environmental issues, and the unpaid accounts payable; (2) whether APT's setoff for the "Losses" incurred as a result of those claims complied with the APA's setoff procedure; and (3) whether APT was entitled to recover its legal fees and expenses. We will address each question in turn.

I. <u>Whether APT was Entitled to Indemnification under the APA for Its Claims Concerning the Inoperable Assets, the Environmental Issues, and the Unpaid Accounts Payable</u>

A. <u>Article 11 of the APA entitles APT to Indemnification</u>

On appeal, APT makes one dispositive argument -- that the trial court's determination that GPT failed to timely respond and object in reasonable detail to APT's first "Claim Notice," as required by § 11.5(c) of

the APA, entitled it to indemnification for the claims regarding the inoperable assets, the environmental issues, and the unpaid accounts payable.[6] We agree.

The parties agree that Article 11 of the APA is unambiguous and governs whether APT is entitled to indemnification for its claims governing the inoperable assets, the environmental issues, and the unpaid accounts payable. When interpreting a contract, this Court is required "'"to enforce an unambiguous, lawful contract, as it is written."'" Public Bldg. Auth. of City of Huntsville v. St. Paul Fire & Marine Ins. Co., 80 So. 3d 171, 180 (Ala. 2010) (citations omitted). "[T]he primary source for determining whether a contract is clear is the text of the document itself; when an instrument is unambiguous its construction and legal effect will be based upon what is found within the four corners

---

[6]Based upon the briefing, it does not appear that GPT is challenging the trial court's judgment in favor of APT on APT's counterclaim regarding the cost to obtain an NPDES permit in the amount of $3,967. The NPDES-permit violation was part of the second "Claim Notice." Indeed, not once in the entire "argument" sections of GPT's appellate briefs does GPT mention the NPDES-permit violation. And, although GPT mentions the NPDES-permit violation in the "facts" sections of its briefs, GPT's discussion does not assert a challenge to the trial court's express findings relating to the NPDES-permit violation. As a result, we will not review the trial court's judgment as it related to APT's indemnity claim regarding the NPDES-permit violation.

of the instrument." Id. at 181.

Here, the relevant language in Article 11 of the APA is found in §§ 11.5(a) and 11.5(c). Section 11.5(a) provides:

> "Any party claiming any right of indemnification under Section 11.2 or Section 11.3 (an 'Indemnified Party') shall notify the party or parties from whom indemnification is sought (the 'Indemnifying Party') as soon as is reasonably practicable after the Indemnified Party becomes aware of any claim that such party has that may result in a Loss (a 'Liability Claim'). Any such notice shall specify the nature of the Liability Claim and the amount or the estimated amount thereof (a 'Claim Notice'). No delay or failure to give a Claim Notice by the Indemnified Party to the Indemnifying Party pursuant to this Section 11.5 shall adversely affect any of the other rights or remedies that the Indemnified Party has under this Agreement or alter or relieve the Indemnifying Party of its obligation to indemnify the Indemnified Party except and solely to the extent that such delay or failure actually and materially prejudiced the Indemnifying Party."

(Emphasis added.) Section 11.5(c) states:

> "If, within twenty (20) days after the receipt of a Claim Notice for a Claim not involving a Third Party Claim, the Indemnifying Party has not given written notice of any good faith objection in reasonable detail to the Indemnified Party in connection with such Claim, then it shall be presumed and deemed that the Indemnifying Party acknowledges and agrees to indemnify the applicable Indemnified Party and the Losses claimed are immediately payable."

(Emphasis added.)

In other words, § 11.5(a) allows APT to send GPT a "Claim Notice"

30

that sets forth any claim APT may have under the APA's indemnification provisions. A "Claim Notice" is defined by § 11.5(a) as a notice that specifies the nature of APT's "Liability Claim" and the actual or estimated amount of that claim.

Once APT sends GPT a "Claim Notice" setting forth its indemnity claims, then, under § 11.5(c), GPT must give "written notice of <u>any good faith</u> objection in <u>reasonable detail</u> to [APT] in connection with [APT's] Claim" within 20 days "<u>after the receipt of a Claim Notice</u>" or it will be "presumed and deemed" that GPT "acknowledge[ed] and agree[d]" to indemnify APT for its claims and such claims will be immediately payable. (Emphasis added.)

In this case it is undisputed that APT's first "Claim Notice" setting forth the claims regarding the inoperable assets, the environmental issues, and the unpaid accounts payable satisfies the definition of "Claim Notice" under § 11.5(a). As a result, the issue in this case is whether GPT responded and objected in reasonable detail to APT's first "Claim Notice" within 20 days of receiving it as required by § 11.5(c).

It is undisputed that Kim's August 26, 2019, email in response to APT's first "Claim Notice" was sent within 20 days of GPT's receiving

APT's first "Claim Notice." However, the trial court found that Kim's "email did not include any detail regarding [GPT's] opposition [to APT's claims] as required by Section 11.5(c) of the Agreement." The record supports this finding.

First, as noted by the trial court, Kim's email contained only three things: (1) "a blanket opposition to APT's 'insists [i]n the letter'" that § 11.5(c) required GPT to respond within 20 days and that § 11.7 gave APT the right to a setoff if APT was entitled to indemnification for its claims; (2) "a notice to APT that Kim would be seeking counsel and would get back to APT 'in a month or so,'" and (3) "a recitation[] of Sections 11.5[(c)] and 11.7 of the [APA]."

Second, Kim admitted at trial that he knew that, under § 11.5(c), he had to object in "reasonable detail" to each of APT's claims set forth in the first "Claim Notice" and that he had failed to do so:

> "[APT's trial counsel]: Nowhere in this August 26, [2019, email] do you address any of the environmental permitting issues, do you?
>
> "A: I didn't.
>
> "Q: And nowhere in [the August 26, 2019, email] did you address any of the environmental wastewater issues, did you?
>
> "A: No, I didn't.

32

"Q: Nowhere in [the August 26, 2019, email] do you address any of the <u>hazardous waste issues</u>, do you?

"A: No, I didn't.

"Q: And nowhere in [the August 26, 2019, email] do you dispute a single one of the <u>accounts payable issues</u> that were raised in the [first 'Claim Notice'] for which APT was requesting indemnification, do you?

"A: No, I didn't.

"Q: And nowhere in [the August 26, 2019, email] do you address <u>even one single piece of equipment</u> that [APT's other trial counsel] raised in [the first 'Claim Notice' as an inoperable asset], right?

"A: Correct.

"Q: And <u>you understood</u> that, because you quoted [§ 11.5(c)] in [the August 26, 2019, email], … <u>you are supposed to respond in reasonable detail to APT, right</u>?

"A: Right.

"….

"Q: <u>Let me ask you this way: You will agree you didn't, not only provide reasonable detail with respect to the opposition, you didn't provide any detail [in the August 26, 2019, email] did you?</u>

"A: <u>I didn't</u>."

(Emphasis added.) Although Kim tried to downplay those admissions by asserting that it can be inferred from his communications with APT that

he had met his obligation to object in "reasonable detail," that is not what § 11.5(c) requires.

Because GPT agreed in § 11.5(c) of the APA to indemnify APT for its environmental-issues, inoperable-assets, and unpaid-accounts-payable claims and because Kim admitted that GPT had failed to timely respond and object in reasonable detail to APT's first "Claim Notice," the record appears to support APT's entitlement to indemnification for the claims set forth in the first "Claim Notice."

However, GPT argues that its failure to respond in reasonable detail under § 11.5(c) is irrelevant because, it asserts, APT's first "Claim Notice" was untimely under § 11.5(a) because it was not sent "as soon as [was] reasonably practicable." The trial court agreed with GPT's position as to the inoperable-assets claim, but not as to the environmental-issues or the unpaid-accounts-payable claims.

Neither GPT nor the trial court has pointed this Court to any text in § 11.5(a) -- or in the APA as a whole -- that indicates that the failure on APT's part to send its first "Claim Notice" "as soon as [was] reasonably practicable" somehow absolved GPT of its obligation to object to APT's first "Claim Notice" within 20 days of receiving it. As stated previously,

34

§ 11.5(c) broadly requires written notice of "any" objection "after the receipt of a Claim Notice." GPT does not dispute that it did not object to the alleged untimeliness of APT's first "Claim Notice" in any of its communications with APT about the first "Claim Notice."[7]

---

[7]Our interpretation of these provisions, moreover, is supported by a Delaware court's analysis of analogous language in another asset-purchase agreement. In HC Cos. v. Myers Industries, Inc., C.A. No. 12671-VCS, Dec. 5, 2017 (Del. Ch. 2017) (not reported in the Atlantic Reporter), the Delaware Court of Chancery held that an indemnifying party's failure to timely object to an indemnification claim "'irrevocably waived the right to contest'" the claim. Id. at *6. Further, although the indemnifying party insisted that the claim notice itself was untimely, the Court of Chancery concluded that, because the indemnifying party had failed to timely object to the claim notice, it was not entitled to raise that defense. According to that court,

"[the indemnifying party's] timing defense to the Second Claim Notice may have carried the day if only [the indemnifying party] had timely raised it. Unfortunately for [the indemnifying party], any delay by [the indemnified party] under Section 8.05(c) of the Purchase Agreement (assuming there was a delay) did not relieve [the indemnifying party] of its obligation to send a written objection. Section 8.05(c) provides that 'the failure to give such prompt written notice shall not, however, relieve the Indemnifying Party … of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure.' [The indemnifying party] has not shown that it forfeited any rights or defenses as a result of [the indemnified party's] delay in submitting the Second Claim Notice, and I can think of no right or defense that [the

Accordingly, any delay on the part of APT in submitting the first

"Claim Notice" to GPT did not relieve GPT of its duty to respond to that

---

indemnifying party] would have lost if it had made a timely objection. In fact, a timely objection would have preserved [the indemnifying party's] rights and defenses, including its defense that [the indemnified party's] Second Claim Notice was untimely.

"[The indemnifying party] does claim that it was prejudiced by [the indemnified party's] delay because it could not make a prompt inspection of the allegedly defective assets listed in the Second Claim Notice. Assuming that is true, that does not amount to a 'forfeit[ure]' of rights and defenses captured by the exception in Section 8.05(c). The only reasonable construction of Section 8.05(c) is that [the indemnified party's] delay in sending a claim notice must be the cause of [the indemnifying party's] forfeiting rights and defenses. But [the indemnifying party] forfeited its defenses only as a result of its delay in objecting to [the indemnified party's] claim. As stated, [the indemnifying party] could have used [the indemnified party's] delay as part of its defense in arguing that [the indemnified party] was not entitled to indemnification, along with any other arguments it might muster in defense of the claim on the merits. According to the plain language of the Purchase Agreement and the Escrow Agreement, however, [the indemnifying party] is not entitled to raise its defenses unless it objects on time. [The indemnifying party] did not object on time, and thus it cannot challenge [the indemnified party's] Second Claim Notice."

(Emphasis and footnotes omitted.)

Claim Notice in a timely manner. Thus, because GPT failed to give APT written, reasonably detailed notice of its objection to the timeliness of APT's first "Claim Notice" -- or <u>any</u> good-faith objection for that matter -- within 20 days of GPT's receiving APT's first "Claim Notice," as required by § 11.5(c), we hold that APT was entitled to indemnification for its claims regarding the inoperable assets, the environmental issues, and the unpaid accounts payable.[8]

---

[8]In its cross-appeal, GPT also argues that the trial court erred in applying § 11.5(c) to the claims involving the hazardous-waste violation and the unpaid accounts payable. Specifically, GPT argues that § 11.5(c), by its terms, applies only to claims "not involving a Third Party Claim" and that the hazardous-waste violation and the unpaid-accounts-payable claims involve third-party claims. In GPT's view, § 11.5(b), not § 11.5(c), applies to those claims. Section 11.5(b) states, in part: "If [APT] assumes the defense of any Third Party Claim, [APT] will not consent to the entry of any judgment or enter into any compromise or settlement <u>without</u> [GPT's] consent (not to be <u>unreasonably withheld, delayed or conditioned</u>)." (Emphasis added.)

GPT is mistaken. The testimony quoted above clearly indicates that GPT's representative at trial -- Kim -- admitted that GPT was obligated to object in "reasonable detail" to the claims involving the hazardous-waste violation and unpaid accounts payable. Thus, we need not resolve this question.

Moreover, as to the hazardous-waste issue, APT sent ADEM's proposed order to GPT with its first "Claim Notice" on August 7, 2019 (at least six weeks before it agreed to the remediation plan), and GPT did not object to APT's consenting to that order at that time. In fact, GPT <u>never objected in writing to the ADEM hazardous-waste consent order</u>.

     B. <u>GPT is Mistaken that APT's Due-Diligence Inspection Excused GPT's Obligation to Indemnify APT for GPT's Breach of Warranty Regarding the Inoperable Assets Based Upon § 6.8 of the APA</u>

Alternatively, in its cross-appeal, GPT argues that we should affirm the trial court's determination that APT was not entitled to indemnification for the inoperable-assets claim because APT "perform[ed] its due diligence inspection [under § 6.8] without presenting a finding of objectionable condition to [GPT] at the time of closing." This argument is a variant of GPT's assertion in its January 2020 response

---

Further, as found by the trial court, APT provided undisputed testimony that if it had failed to agree to ADEM's consent order, ADEM would have unilaterally ordered the same remedy.

As to the unpaid accounts payable, § 11.5(b) would not apply to the claim regarding the various unpaid accounts payable because the APA has an additional provision -- § 6.11 -- that specifically covers accounts-payable issues and makes clear that APT was authorized to pay such accounts payable. That provision states, in part:

> "In the event that any Seller Indebtedness or any Accounts Payable remains outstanding thirty (30) days following the Closing, Buyer has the option, <u>in its sole discretion</u>, to pay off the outstanding Seller Indebtedness or Accounts Payable itself. Any amount so paid by Buyer <u>shall be set off</u> against the amounts outstanding under the Promissory Note."

§ 6.11 of the APA (emphasis added).

letter to APT's second "Claim Notice" that the APA was "based on 'AS IS' condition."

As to this issue, the trial court found that,

"[b]ecause a due diligence inspection or investigation was completed by APT and [GPT was] not notified of any objectionable condition, … [the brake line] was in satisfactory condition at the time of closing. Had APT made such a finding of objectionable condition following inspection, it would have had two options: (a) terminate the agreement or (b) proceed to closing subject to an equitable adjustment to the Purchase Price. APT exercised neither of the remedies provided in Section 6.8(b)."

(Emphasis added.)

As stated previously, "'[i]f a contract can be interpreted without going beyond the four corners of the document, the trial court's resolution of the question of law is accorded no presumption of correctness, and this Court's review is de novo.'" Lafayette Land Acquisitions, ___ So. 3d at ___ (quoting Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res., 986 So. 2d 1093, 1101 (Ala. 2007)). When interpreting a contract, we look at the entire contract to discern the intent of the contracting parties and to enforce the contract as it is written. See Ex parte Warren Averett Cos., 368 So. 3d 827, 835 (Ala. 2022).

The express language of § 6.8(a) provides that GPT "will … make

the … Purchased Assets, the Real Property, and other matters pertaining to the Business available for examination, inspection, and review by [APT] … and fully cooperate with such examination, inspection, and review by [APT]." Section 6.8(a) also provides that "[n]o such review or investigation by [APT] … shall affect, diminish, terminate, or give rise to a waiver of any of the representations, warranties, or covenants of [GPT] expressed herein." (Emphasis added.) Thus, because the text of § 6.8(a) expressly prohibits the defensive application of a due-diligence inspection, the trial court's conclusion that APT was not entitled to indemnification because APT "actually performed its due diligence inspection without presenting a finding of objectionable condition to [GPT] at the time closing" was incorrect.

Moreover, GPT's premise is flawed. It is simply untrue that the "Purchased Assets" in this case were sold "AS IS." And the argument that the preclosing due-diligence inspection was APT's sole remedy ignores the express warranty provided by GPT that the equipment was in "satisfactory condition and is suitable for the purpose for which it is being used …." We are therefore unpersuaded by GPT's alternative argument here, and, for the reasons stated previously in this opinion, we

reverse the trial court's judgment on the inoperable-assets issue.

II. Whether APT's Setoff Breached the Procedural Requirements for a Setoff Set Forth in the APA, Thus Entitling GPT to Accelerate the Remaining Annual Installment Payments Owed by APT Under the Note

In its cross-appeal, GPT argues that even if APT was entitled to indemnification for all three of the claims discussed above, we should nevertheless reverse and remand with instructions directing the trial court to order the acceleration of the remaining installment payments owed by APT under the Note because, it says, the trial court failed to determine whether APT's first setoff in 2020 complied with the APA's setoff procedures.

Section 11.7 of the APA governs setoffs. That section addresses how payment is made -- not whether payment is owed -- and states, in relevant part:

"[APT] shall be entitled to set off against any payments owed to [GPT] hereunder, including but not limited to any outstanding amounts owed in respect of all Losses for which [APT] is entitled to indemnification pursuant to this Agreement. Prior to such set off, [APT] shall send a set off notice to [GPT]. If [GPT] dispute[s] all or any portion of the set off stated in the set off notice, [GPT] shall set forth an objection in writing within twenty (20) calendar days after receipt of such set off notice and the Parties shall attempt in good faith to resolve such dispute. If the Parties are unable to resolve the dispute with respect to a contested set off notice

41

within sixty (60) calendar days …, then [APT] shall have the right to send a final set off notice to [GPT] and immediately set off the amount that [APT] claims in good faith …."

(Emphasis added.) As discussed above, APT was "owed … Losses" and was "entitled to indemnification pursuant to [the APA]" for its claims regarding the inoperable assets, the environmental issues, and the unpaid accounts payable because GPT acknowledged and agreed to indemnify APT for those claims under § 11.5(c). Thus, the real issue before us now is whether APT's <u>first</u> setoff complied with the procedures for a setoff set forth in § 11.7.

Contrary to GPT's argument, the trial court's judgment expressly determined that APT had complied with § 11.7's requirement that it send GPT written notice of its setoff before exercising its right of setoff. The trial court also expressly found that GPT did not dispute APT's setoff within 20 days of receiving APT's notice of its first setoff as required by § 11.7. Specifically, the trial court found that,

"[o]n April 28, 2020, APT sent its letter informing [GPT] that APT would withhold payment of the first installment of $400,000.00 as a set off for the claimed indemnification amounts pursuant to Section 11.7 of the Agreement. After [GPT] did not respond to said notice, APT sent a Final Notice of Set Off on June 30, 2020 and thereafter set off the entire first installment payment."

42

The record undisputedly supports the trial court's finding, and GPT fails to point to any evidence that suggests otherwise. Thus, we are unpersuaded by GPT's argument, and we affirm the trial court's determination that GPT was not entitled to an acceleration of the remaining annual installment payments APT owed under the Note.

III. <u>Whether APT Was Entitled to Recover its Attorneys' Fees and Legal Expenses</u>

Finally, APT challenges the trial court's determination regarding the recovery of its attorneys' fees and legal expenses. In its judgment, the trial court found that APT's recovery of its attorneys' fees and legal expenses was governed by § 14.8 and that APT was not allowed to recover <u>any</u> of its attorneys' fees and legal expenses because it had prevailed only on some but not all of its claims. We disagree with the trial court's conclusion on this issue.

As to the attorneys' fees and legal expenses APT incurred as a result of its indemnity claims against GPT, including the fees and expenses APT set off from the June 2020 and June 2022 installment payments, we note that § 14.8 of the APA provides that, "[i]n the event of litigation or other adversary proceeding with respect to this Agreement or the transactions contemplated hereby, <u>the non-prevailing Party shall</u>

43

reimburse the prevailing Party for all reasonable attorneys' fees and court costs incurred in connection therewith, whether incurred at trial or on appeal." (Emphasis added.)

The term "prevailing party" is not defined by the APA, and our caselaw offers no clear definition of the term. According to Black's Law Dictionary, however, a "prevailing party" is "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded." Black's Law Dictionary 1351 (11th ed. 2019). Relying on the definition of "prevailing party" in Black's Law Dictionary, the United States Supreme Court has previously recognized that "a 'prevailing party' is one who has been awarded some relief by the court." Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Hum. Res., 532 U.S. 598, 603 (2001) (citing Black's Law Dictionary 1145 (7th ed. 1999))(emphasis added). Accordingly, a party is a "prevailing party" if a judgment is rendered in its favor and a court has awarded it "some relief."[9]

Here, as discussed previously, the trial court properly rendered a judgment in favor of APT on its indemnity claims regarding the

---

[9]Because we hold that APT should prevail on all of its claims, we need not decide whether a party is a prevailing party if it is awarded some, but not all, of the relief that it sought.

environmental issues and the unpaid accounts payable. Additionally, as explained above, APT was also entitled to a judgment in its favor on its indemnity claim regarding the inoperable assets and on GPT's breach-of-contract claim regarding APT's setoff from the first installment payment.

As explained above, the trial court should have also declared that APT was entitled to indemnification for and properly set off its costs regarding the inoperable-assets claim. Thus, based on the foregoing, APT is a "prevailing party" as contemplated in § 14.8 of the APA.

Likewise, despite GPT's success on a claim (the trial court rendered a judgment in GPT's favor on APT's fraudulent-misrepresentation claim), GPT is the "nonprevailing party" because GPT was not entitled to any of the relief it sought. For instance, because APT was entitled to indemnification for all of its claims and properly setoff its "Losses" for those claims, GPT was not entitled to any monetary damages for the amount APT setoff from the installment payments owed to GPT under the Note, and GPT was not entitled to a judgment declaring that it is allowed to accelerate the remaining installment payments owed to it under the Note.

Thus, for the foregoing reasons, we hold that APT was entitled to

recover its attorneys' fees and legal expenses.[10] Accordingly, we reverse that portion of the trial court's judgment and remand the case for proceedings consistent with this portion of our opinion so that the trial court can determine the appropriate amount of attorneys' fees and legal expenses to award to APT. See Peebles v. Miley, 439 So. 2d 137, 140 (Ala. 1983) (discussing the factors a trial court should consider when determining the attorneys' fees to award a party).

Conclusion

Based on the foregoing, in APT's appeal -- appeal no. SC-2023-0250 -- we reverse the portion of the trial court's judgment denying APT relief on its inoperable-assets claim. We also reverse the trial court's denial of APT's claim for attorneys' fees and legal expenses and remand the case to the trial court for proceedings consistent with this Court's analysis of that issue. Additionally, in GPT's cross-appeal -- appeal no. SC-2023-0271 -- we affirm the trial court's judgment as to APT's claims for

---

[10]In addition to arguing that § 14.8 of the APA governs, APT also argues that its legal fees qualify as "losses" as defined in § 1.1 of the APA and are thus governed by the duty to indemnify. However, because we hold that APT is now the "prevailing party" on all of its claims, we need not determine whether APT was entitled to recover its legal fees as "losses" or even whether the prelitigation portion of those fees might qualify as "losses."

indemnification concerning the environmental issues and the unpaid accounts payable as well as the trial court's determination that GPT was not entitled to accelerate the remaining annual installment payments APT owed under the Note.

SC-2023-0250 -- REVERSED AND REMANDED.

Parker, C.J., and Shaw, Bryan, and Mitchell, JJ., concur.

Sellers, J., dissents, with opinion, which Wise, Mendheim, and Stewart, JJ., join.

SC-2023-0271 -- AFFIRMED.

Parker, C.J., and Shaw, Wise, Bryan, Sellers, Mendheim, Stewart, and Mitchell, JJ., concur.

SELLERS, Justice (dissenting in appeal no. SC-2023-0250).

I would affirm the judgment of the trial court in all respects; therefore, I dissent in appeal no. SC-2023-0250. Specifically, I would affirm that part of the trial court's judgment concluding that Alabama Plating Technology, LLC ("APT"), is not able to succeed on its indemnity claim regarding the inoperable assets. The asset-purchase agreement ("the APA") provides that, after APT becomes aware of any claim that may result in a loss, it must notify Georgia Plating Technology, LLC; DVEST, LLC; and Jin Kim (collectively referred to as "GPT") "as soon as is reasonably practicable." § 11.5(a). It further provides that the failure to provide timely notice of a claim relieves GPT of its obligation to indemnify under the APA if such notice "actually and materially prejudiced" GPT. Id. Thus, timely notice of a claim is a prerequisite to indemnification under the APA. Whether the four-month delay on the part of APT in providing notice of its inoperable-assets claim was reasonable and, if not, whether that delay actually and materially prejudiced GPT were questions of fact for the trial court to resolve. The trial court specifically concluded that the purported inoperable assets were in satisfactory condition on the date of the closing because, it found,

48

APT had conducted a due-diligence inspection of the assets and never objected to the condition of any of those assets before purchasing them. The trial court further found that, within a week of the closing date, APT actually knew the cost to replace the purported inoperable assets. Thus, the trial court found that the four-month delay on the part of APT in notifying GPT of the claimed inoperable assets deprived GPT of the opportunity to inspect those assets "to form any viable method of providing APT with written notice of a good faith objection in reasonable detail regarding the claimed inoperable assets." Under our well-established ore tenus rule, a trial court's findings of fact are presumed correct, and its judgment based on those findings will not be reversed absent a plain and palpable excess of discretion. Fort Morgan Civic Ass'n v. City of Gulf Shores, 100 So. 3d 1042 (Ala. 2012). After reviewing the judgment in this case, I find nothing obviously wrong that would hint that the trial court plainly and palpably exceeded its discretion or that would otherwise provide a legal basis for reversal. Further, the trial court was in the best position to review all the factual evidence and to decide the issues based on that evidence. Given the reasonableness of the judgment and the deference due to the trial court as the finder of fact, I

49

am unwilling to substitute my judgment for that of the trial court. Accordingly, I would affirm the trial court's judgment holding that APT was not entitled to succeed on its indemnity claim regarding the inoperable assets; I would also affirm its judgment insofar as it orders each party to be responsible for its own attorney fees and costs.

Wise, Mendheim, and Stewart, JJ., concur.